UNITED STATES of America, Appellee,

v.

Phillip ROSSOMANDO, Defendant–
Appellant.

Docket No. 97–1491.

United States Court of Appeals,
Second Circuit.

Argued March 6, 1998.

Decided April 10, 1998.

Edward A. McDonald, Reboul, MacMur-
ray, Hewitt, Maynard & Kristol, New York
City (Lisa A. Ferrari, John C. Ertman, of
counsel), for Defendant–Appellant.

Jonathan S. Sack, Assistant United States
Attorney for the Eastern District of New
York, Brooklyn, NY (Zachary W. Carter,
United States Attorney for the Eastern Dis-
trict of New York, Emily Berger, Assistant
United States Attorney, of counsel), for Ap-
pellee.

Before: OAKES and CABRANES, Circuit
Judges, and HURLEY, District Judge *.

---

* The Honorable Denis R. Hurley, of ·the United
States District Court for the Eastern District of
New York, sitting by designation.

JOSÉ A. CABRANES, Circuit Judge:

Defendant-appellant Phillip Rossomando appeals from a judgment of the United States District Court for the Eastern District of New York (Raymond J. Dearie, *Judge*), convicting him of one count of mail fraud under 18 U.S.C. § 1341.[1] Rossomando argues that the court's jury charge improperly suggested that the government did not have to prove that Rossomando intended to harm his victim in order to be guilty of mail fraud. We agree, and therefore reverse the judgment of the district court.

## I.

Rossomando is a retired New York City firefighter who was awarded a disability pension in 1989 as the result of a service-related injury. The New York City Fire Department's Pension Bureau ("Pension Bureau"), which administers the payment of benefits to retired firefighters, permits a retired firefighter to earn outside income while receiving a disability pension, but limits the amount that may be earned by a disabled firefighter, without sacrificing a portion of the disability pension, prior to the twentieth anniversary of his hire date. The maximum amount of outside income that a firefighter may earn before being required to reimburse the excess to the Fire Department's Pension Fund ("Pension Fund") is called the "Safeguard Limitation." The Safeguard Limitation is determined for each pensioner using a calculation that factors in the base salary of "the next highest rank" to that at which the pensioner retired, along with several adjustments, the most important of which is the number of overtime hours worked by the pensioner in his final year of service. Until the twentieth anniversary of his hire date, a disabled firefighter is required to complete Pension Bureau questionnaires reporting his outside income so that the Pension Bureau can determine whether the Pension Fund is entitled to any recoupment.

Although the Pension Bureau's regular practice is to send out questionnaires annually, due to administrative problems it failed to mail questionnaires for the years 1991–1993 in a timely fashion, and instead mailed them in 1995 together with the 1994 income-year questionnaire. Rossomando, who had held numerous jobs in the years since his retirement in 1989, completed the forms, but a subsequent comparison of these forms to his income tax returns revealed that he provided the Pension Bureau with false information about his outside employment and understated his outside income by more than $100,000 over the four-year period, resulting in a $43,218 loss to the Pension Fund. The government charged Rossomando in a one-count indictment of violating the mail-fraud statute, 18 U.S.C. § 1341.

Rossomando's primary defense at trial was that he lacked the requisite intent to harm the Pension Fund. He claimed that, based on his mistaken understanding of the applicable Safeguard Limitation—allegedly gained from speaking to union personnel and other Fire Department employees—he believed that his outside earnings did not even approach, much less exceed, the level at which the Pension Fund would be entitled to reimbursement. Under pressure to complete the questionnaires before the deadline (after having failed to open them for some time), and unable to locate his income tax returns for the relevant years, Rossomando claimed that he carelessly filled out the forms using incomplete and inaccurate information, but did not believe that the incorrect information would cause any loss to the Pension Fund because he believed his earnings fell well below the applicable Safeguard Limitation.

The court's jury charge properly indicated that Rossomando had to have intended to harm the Pension Fund in order to be guilty

---

1. 18 U.S.C. § 1341 provides, in pertinent part:

    Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized deposi-

    tory for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, ... shall be fined under this title or imprisoned not more than five years, or both.

of mail fraud, stating that "the government must prove that the alleged scheme contemplated depriving another of money or property," and that "[i]ntent to defraud simply means to act knowingly and with the specific intent to deceive for the purpose of causing some financial or property loss to another." Later in the charge, however, the court instructed the jury as follows regarding the possibility of a "good-faith defense":

Since an essential element of the crime charged is an intent to defraud, it follows that good faith on the part of the defendant is a complete defense to the charge of mail fraud. . . .

Under the mail fraud statute, even false representations or statements or omissions of material fact do not amount to fraud unless done with fraudulent intent, as I've told you. However misleading or deceptive a plan may be, it is not fraudulent if it was devised or carried out in good faith. An honest belief in the truth of the representations made by the defendant or an honest belief that all material information had been disclosed is a good defense, however inaccurate the statements may turn out to be.

In considering whether or not the defendant acted in good faith, you are instructed that *a belief by the defendant, if such a belief existed, that ultimately everything would work out so that no one would lose any money does not require a finding by you that he acted in good faith. No amount of honest belief on the part of the defendant that the scheme would not ultimately result in a financial loss to the New York City Fire Department or its Pension Fund will excuse fraudulent actions or false representations by him to obtain money,* provided, of course, that the government proves beyond a reasonable doubt that the defendant acted with the specific intent to defraud.

(emphasis added).

During a colloquy that occurred prior to the charging of the jury, the defendant's trial counsel, who does not represent him on appeal, mildly and somewhat ambiguously objected to the portion of the charge italicized above, arguing that it suggested that Rossomando could be convicted despite having had no intent to harm the Pension Fund. The Assistant United States Attorney litigating the case for the government defended the language, stating that it was intended to "take[ ] away the no harm, no foul defense," and proceeded to give an example of such an (illegitimate) defense: "someone who files false forms to a bank, says 'The bank didn't end up losing any money so it was okay and I really didn't mean for the bank to lose any money because I meant to pay back my loan.'" The court stated that "[t]hat's clearly what it's addressed to," but told defense counsel that it understood counsel's concern, and would be "happy to consider" additional or alternative language he might suggest. Defense counsel stated that he would "work on that language," but failed to submit anything to the court. Immediately before the issuance of the charge, defense counsel raised the issue once again, albeit in a half-hearted manner that verged on acquiescence to the court's instruction.[2]

After the jury began deliberations, it submitted a note to the court containing several questions, including a request that the court clarify the legal definition of "intentional." The court gave the following supplemental charge on intent:

The government in this case is required to prove beyond a reasonable doubt that the defendant lied; that is to say, he intentionally deceived the Fire Department on the questionnaires to keep pension benefits or monies that he would not otherwise be entitled to. That's what this case is about, as you well know. . . . They must establish beyond a reasonable doubt each of the three elements of the crime I instructed you on this morning, the instructions for

---

**2.** The government argues that defense counsel affirmatively assented to the court's charge both before and immediately after it was given. Although the language highlighted by the government does suggest acquiescence to the court's charge, based on the context in which these statements were made it is unclear whether defense counsel was expressing satisfaction with the *entire* charge, or particular aspects of the charge—other than the portion relevant here—that were under discussion.

which are repeated in the written instructions that you now have.

... I hope that responds to your inquiry concerning "intentional." He must have intended to deceive[ ]. He must have lied to the Fire Department to keep pension monies that he would not otherwise have been entitled to. That's what the government must prove.

When asked whether this instruction was satisfactory, defense counsel responded affirmatively.

The jury returned a verdict of guilty. The court downwardly departed from Rossomando's Sentencing Guidelines range of 12 to 18 months' imprisonment—"[l]argely on the basis of [Rossomando's] otherwise law-abiding and responsible conduct, [and] the aberrational nature of this particular crime"—and sentenced Rossomando principally to six months' imprisonment followed by six months' home detention, as well as a three-year term of supervised release, including as a special condition restitution to the Pension Fund of the monies owed.

We were informed at oral argument, on March 6, 1998, that Rossomando had just begun to serve the term of imprisonment prescribed in his sentence. On March 11, 1998, we entered a summary order vacating the judgment of the district court, including any order of incarceration, and indicated that an opinion would follow in due course.

## II.

■ The parties dispute the proper standard of review applicable to Rossomando's challenge to the court's jury instructions. Defense counsel did voice an objection to the court's initial charge, but his objection was somewhat muddled, leaving it a close question whether the objection was adequately raised. *See* Fed.R.Crim.P. 30 ("No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, *stating distinctly the matter to which that party objects and the*

*grounds of the objection"*) (emphasis added); *United States v. Masotto,* 73 F.3d 1233, 1237 (2d Cir.1996) (Under Rule 30, the objection "must direct the trial court's attention to the contention that is to be raised on appeal," and must "provide the trial court with an opportunity to correct any error in the jury instructions before the jury begins deliberating.") (internal quotation marks and citations omitted). Defense counsel thereafter failed to follow through on the court's invitation to submit alternative language. Additionally, portions of the record, though ambiguous, arguably suggest acquiescence to the initial charge on the part of the defense. *See supra* note 2.

■ Although it may be unclear whether the defense adequately preserved its objection to the court's *initial* charge, defense counsel did affirmatively state that he was satisfied with the court's supplemental charge. Inasmuch as Rossomando's challenge to his conviction depends on the argument that the court's supplemental charge failed adequately to correct its misleading initial charge, and inasmuch as the defense failed to object to the supplemental charge, we will review only for plain error, *see* Fed. R.Crim.P. 52(b) (plain error standard).[3] This standard requires there to be "(1) error, (2) that is plain, and (3) that affect[s] substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States,* 520 U.S. 461, ——, 117 S.Ct. 1544, 1549, 137 L.Ed.2d 718 (1997) (internal quotation marks and citations omitted, alterations in original). We conclude that the court's initial charge posed a genuine risk of confusing the jury into believing that it would be proper to convict Rossomando of mail fraud without finding that he contemplated harm to the Pension Fund, *see, e.g., United States v. Starr,* 816 F.2d 94, 98 (2d Cir.1987) ("Only a showing of intended harm will satisfy the

---

**3.** Notably, this is not a case in which we might overlook counsel's failure to renew his objection because it had been so forcefully presented and unequivocally rebuffed by the court that "it was

apparent that further efforts to object would be unavailing." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994).

element of fraudulent intent."), and that the court's supplemental charge on intent did not adequately cure any such potential misperception. We therefore reverse the district court's judgment because we are not fully confident that the jury found Rossomando guilty of an essential element of mail fraud, and because our doubts are sufficient to call into question the fairness and integrity of Rossomando's conviction.

As noted above, the court did properly inform the jury that "the government must prove that the alleged scheme contemplated depriving another of money or property," and that intent to defraud requires an intent to cause "some financial or property loss to another." However, these statements were seemingly contradicted by the subsequent instruction—regarding the possibility of a "good-faith defense"—that "[n]o amount of honest belief on the part of the defendant that the scheme would not ultimately result in a financial loss to the New York City Fire Department or its Pension Fund will excuse fraudulent actions or false representations by him to obtain money."

The court's "good-faith defense" instruction was drawn from 2 Leonard B. Sand, *et al., Modern Federal Jury Instructions* § 44.01, at 44–28 to –29 (Instruction No. 44–5). On its face, this "pattern" instruction appears to be at odds with the requirement that a defendant must have intended to harm his victim in order to be guilty of mail fraud; that is, an "honest belief on the part of the defendant that the scheme would not ... result in a financial loss" to his victim *is* a defense to mail fraud. *See, e.g., United States v. Wallach*, 935 F.2d 445, 461 (2d Cir.1991) (contemplated harm to victim is required element of mail fraud); *Starr*, 816 F.2d at 98 (same). However, the

key word in the relevant portion of the "good-faith defense" pattern instruction is "ultimately," and the point that this portion of the instruction seeks to convey is that where some immediate loss to the victim is contemplated by a defendant, the fact that the defendant believes (rightly or wrongly) that he will "ultimately" be able to work things out so that the victim suffers no loss is no excuse for the real and immediate loss contemplated to result from defendant's fraudulent conduct. *See* Sand, *Modern Federal Jury Instructions* § 44.01, at 44–35 ("As the recommended instruction states, no amount of honest belief that the scheme will ultimately work out excuses any fraudulent actions or representations."). Hence, in the example invoked by the government in defending the court's instruction, where a defendant deliberately supplies false information to obtain a bank loan, but plans to pay back the loan and therefore believes that no harm will "ultimately" accrue to the bank, the defendant's good-faith intention to pay back the loan is no defense because he intended to inflict a genuine harm upon the bank [4]—*i.e.,* to deprive the bank of the ability to determine the actual level of credit risk and to determine for itself on the basis of accurate information whether, and at what price, to extend credit to the defendant. *See United States v. Dinome*, 86 F.3d 277, 280, 284 (2d Cir.1996) (in case using same good-faith defense instruction as instant case, holding that intentionally supplying false information on mortgage application was proper basis for mail fraud conviction because it deprived bank of right to control its assets and "diminished the ultimate value of the [mortgage] transaction to the bank as defined by its standard lending practices") (internal quotation marks and citation omitted, alteration in original).[5]

4. It is also irrelevant whether such a defendant does in fact pay back the loan, or more generally, whether the victim of a fraudulent scheme does in fact suffer harm, so long as concrete harm was contemplated. *See, e.g., Wallach*, 935 F.2d at 461; *Starr*, 816 F.2d at 98.

5. *Dinome* is an example of a case in which the concrete harm contemplated by the defendant is to deny the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions. *See also Unit-*

*ed States v. Rodolitz*, 786 F.2d 77, 80–81 (2d Cir.1986) (where defendant set up elaborate scheme to conceal fraudulent nature of insurance claims, "the government needed to prove only that [defendant] employed a deceptive scheme intended to prevent the insurer from determining for itself a fair value of recovery"). The government relies on cases such as *Dinome* and *Rodolitz* to argue that by withholding information from the Pension Fund, Rossomando satisfied the intent-to-harm element of mail fraud even if he did not believe he was causing the

In cases in which there is a sufficient predicate in the record for the "no ultimate harm" charge—as in *Dinome*, where the charge was given, *see* 86 F.3d at 280—the risk that a jury might be misled into believing that no harm need be intended is reduced, because in such cases it should be clearer what the court means when it states that, on the one hand, the defendant must have intended to harm his victim, but on the other hand, it is no defense that he believed "no ultimate harm" would result from his scheme. Here, however, the essence of Rossomando's defense was not that he thought the Pension Fund would not "ultimately" lose money, but that he thought it was *never* going to lose money because his income was well below the level at which the false information he provided would become relevant. In the absence of a sufficiently clear referent for the court's "no ultimate harm" instruction, there is a substantial risk that the jury could have been confused into believing that the government was not required to prove that Rossomando intended to harm the Pension Fund. Simply put, the jury could well have been persuaded by Rossomando's defense that he did not intend to harm the Pension Fund, but still have believed that it should convict because "[n]o amount of honest belief on the part of the defendant that the scheme would not ultimately result in a financial loss to the New York City Fire Department or its Pension Fund will excuse fraudulent actions or false representations by him to obtain money."

We are aware, of course, that the above-quoted language was followed by a significant qualifying phrase: "provided, of course, that the government proves beyond a reasonable doubt that the defendant acted with the specific intent to defraud." This phrase referred back to the earlier instruction that "[i]ntent to defraud simply means to act knowingly and with the specific intent to deceive for the purpose of causing some financial or property loss to another." Through a skillful parsing of the court's charge, one might attempt to downplay the potential confusion arising from the "no ultimate harm" instruction by arguing that, whatever the jury should have been expected to make of this instruction, it was told that it still needed to find "specific intent." However, at least where there was an insufficiently clear predicate for the "no ultimate harm" instruction, the task that jurors were being asked to perform in order to reconcile this instruction with the earlier instruction requiring proof of "specific intent to defraud" was simply too ambiguous and obscure to inspire confidence. The fact that the "no ultimate harm" instruction came toward the end of the charge only exacerbated the problem, *see Bollenbach v. United States*, 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946) ("Particularly in a criminal trial, the judge's last word is apt to be the decisive word."), and the jury's request that the court clarify the definition of intent is the surest signal that the jurors were indeed confused.

Pension Fund to lose money, and that this is all the challenged portion of the charge conveyed to the jury. The government's reliance on these cases is misplaced.

In cases resting upon the so-called "right to control" theory of mail fraud, "the information withheld either must be of some independent value or must bear on the ultimate value of the transaction." *Dinome*, 86 F.3d at 284 (internal quotation marks and citation omitted). If providing false information on a mortgage application (as in *Dinome*), or preventing an insurer from deciding the true value of a claim (as in *Rodolitz*), inherently lessened the value of the relevant transactions to the bank and the insurance company, the same cannot be said in the instant case. Whereas the value of credit or insurance transactions inherently depends on the ability of banks and insurance companies to make refined, discretionary judgments on the basis of full information, the Safeguard Limita-

tion calculation to be made by the Pension Bureau in this case was entirely mechanical, and it cannot meaningfully be said that the information withheld by Rossomando had "independent value" to the Pension Fund. If Rossomando had been correct in believing that the Pension Fund would not have been entitled to any reimbursement had he provided a full reporting of his outside income, there would have been no remaining injury to the Pension Fund on the basis of its having been deprived of the "right to control" its resources, because no discretionary "control" was truly being exercised. Accordingly, if Rossomando was aware that he was withholding information from the Pension Fund but believed that the Fund would not lose any money as a result, his defense that he lacked the requisite intent for mail fraud would have been legitimate. The question is whether the court's charge may have misled the jury into believing otherwise.

In light of the misleading nature of the court's initial charge, and the jury's evident confusion on the issue of intent, the court, in responding to the jury's request for further guidance, was under a compelling duty to clarify that in order to convict Rossomando the jury had to find that he intended to harm the Pension Fund. *See Bollenbach,* 326 U.S. at 612–13, 66 S.Ct. at 405 ("When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy."); *Tart v. McGann,* 697 F.2d 75, 76 (2d Cir.1982) (duly observing that "trial judges in the heat of a trial are forced to respond quickly to jury requests . . . and that it is certainly far easier for an appellate court to fashion an appropriate response some months later, after much reflection," but emphasizing that courts nonetheless must exercise "special care" in responding to jury requests unambiguously). Although the court's supplemental instruction could certainly be read to have made this point about intent to harm, the instruction is not unambiguous. The court told the jury that Rossomando "must have lied to the Fire Department to keep pension monies that he would not otherwise have been entitled to." This instruction might be understood in the following two ways: (1) to require (properly) the government to prove that Rossomando lied with the intent to deprive the Pension Fund of monies he *knew* he was not entitled to; or (2) to require (improperly) the government to prove only that Rossomando knowingly lied and *as a result* kept monies that he was not entitled to, *even if he was not aware that he was not entitled to them* or that the Pension Fund would suffer any harm from his lies.

These are two different propositions, and indeed the latter is not inconsistent with Rossomando's defense. Rossomando does not deny that he lied to the Pension Fund, nor does he deny that he was not entitled to monies in excess of the cap; his defense, rather, was that he did not intend to deprive the Pension Fund of any such monies be-

cause he believed his income was well below the cap. Again, because the court's initial charge raised the real possibility that the jury could have believed Rossomando's legitimate defense and still returned a guilty verdict, and because the jury was evidently confused on the question of intent, the integrity of Rossomando's conviction critically depended on the supplemental instruction leaving no doubt whatsoever that Rossomando had to have contemplated harm to the Pension Fund in order to be found guilty of mail fraud. This is certainly a plausible understanding of the court's supplemental instruction, and may indeed be the more convincing of the two plausible readings. We have no doubt that, standing alone, the ambiguity in the court's supplemental charge regarding intent to harm would not constitute plain error. However, because the court's initial charge could have utterly vitiated Rossomando's defense, and because the jury's request for further instruction is a concrete indication that it may in fact have done so, the failure of the supplemental charge to restore Rossomando's defense critically undermines our confidence in Rossomando's conviction, and warrants reversal for plain error.

### III.

 Having determined that the court's initial charge could easily have misled the jury into convicting Rossomando without finding that he intended to harm the Pension Fund, and that after the jury expressed its confusion regarding the requisite level of intent the court's supplemental charge did not adequately extinguish this possibility, we reverse the judgment of the district court for plain error.[6]

---

**6.** In light of our decision, we have no need to address the other challenges to the court's judgment raised by Rossomando, although we briefly discuss one issue particularly likely to resurface in the event that Rossomando is retried. Rossomando challenged the court's decision to limit

the cross-examination of Milton DeRienzo, Deputy Director of the Pension Bureau and chief witness for the government, regarding a 1996 meeting at which the firefighters' union expressed to DeRienzo its belief as to how the Safeguard Limitation should be calculated. Ros-

somando sought to admit this evidence to support his claimed understanding of the Safeguard Limitation calculation as of the time he filled out the questionnaires in 1995, which understanding he allegedly gained from conversations with union personnel and other firefighters at the time of his retirement in 1989. The district court concluded that evidence of the 1996 meeting—at which Rossomando was not present, and which occurred seven years after Rossomando retired and a year after Rossomando filled out the questionnaires at issue—posed a risk of confusing the jury that outweighed the probative value of the evidence. See Fed.R.Evid. 403. We have considered the issue, and conclude that the court acted well within its discretion in limiting the cross-examination of DeRienzo. See Hathaway v. Coughlin, 99 F.3d 550, 555 (2d Cir.1996) (Rule 403 evidentiary rulings reviewed for abuse of discretion).