**UNITED STATES of America, Appellee,**

v.

**Felix BERKOVICH, Defendant–Appellant.**

**Docket No. 98–1164.**

United States Court of Appeals, Second Circuit.

Argued Dec. 7, 1998.

Decided Jan. 25, 1999.

James J. Benjamin, Jr., Assistant United States Attorney for the Southern District of New York (Mary Jo White, United States Attorney; Dietrich L. Snell, Assistant United States Attorney, of counsel), New York, New York, for Appellee.

Robert Preuss, Abate & Preuss (Camille M. Abate, of counsel), New York, New York, for Defendant–Appellant.

Before: WINTER, Chief Judge, OAKES and JACOBS, Circuit Judges.

WINTER, Chief Judge:

Felix Berkovich appeals from his conviction for mail fraud following a jury trial before Judge Koeltl. Relying on our recent decision in *United States v. Rossomando,* 144 F.3d 197 (2d Cir.1998), Berkovich contends that the district court's charge improperly suggested that the government did not have to prove that he intended to harm his victim in order to be guilty of mail fraud. He further argues that: (i) his post-arrest statements should have been suppressed because his waiver of *Miranda* rights was involuntary, (ii) his trial counsel was ineffective, and (iii) the government's conduct was so outrageous that it ran afoul of the Fifth Amendment. We disagree and affirm.

## BACKGROUND

Until April 1995, Berkovich was a mutual fund broker and registered representative of Liberty Securities Corporation. Berkovich opened and administered customer accounts and sold shares in numerous funds including Franklin Funds. In order to withdraw more than $50,000 from this fund, the account holder had to make a signed request authenticated by a financial institution's signature guarantee stamp. Berkovich was fired in April 1995.

We view the evidence in the light most favorable to the government as is necessary

to place some of the defendant's contentions in context. *See United States v. Duggan*, 743 F.2d 59, 65 (2d Cir.1984). While employed at Liberty, Berkovich developed a scheme to steal from Franklin Funds accounts, which he proposed to Alexander Gvozdev. However, Gvozdev contacted the Federal Bureau of Investigation, told them of the plot, and agreed to act as an informant. Over the next five months, the FBI recorded six meetings between Gvozdev and Berkovich, and Gvozdev recorded a number of telephone conversations, although other conversations between them were not recorded.

In order to facilitate the scheme, Berkovich requested that Gvozdev open an account to deposit money taken from the accounts. To that end, the FBI opened an account at Chemical Bank. In November 1995, Berkovich targeted an account in the name of Stefan Wroblewski and requested that $50,000 from Wroblewski's Franklin Funds account be placed in their Chemical Bank account. Berkovich obtained the necessary information from an account statement that he had taken with him upon his firing by Liberty. He used a counterfeit signature guarantee stamp on the redemption form that was sent to Franklin Funds via UPS. The account, however, had been closed, and the FBI notified Franklin Funds that the transfer request was fraudulent. Nonetheless, Gvozdev informed Berkovich that the money had been deposited in their account, and Berkovich reacted to the news with excitement.

On November 29, 1995, Berkovich and Gvozdev met again. The meeting was videotaped, and Gvozdev provided Berkovich with $22,500 in government funds—Berkovich's share of the fraud proceeds. Berkovich then proceeded to prepare a second fraudulent redemption form, this time requesting $75,-000 from a different account. As he was about to leave the meeting, FBI agents placed him under arrest. Special Agent Steven Garfinkel spent approximately fifteen minutes explaining Berkovich's predicament to him and then read him his *Miranda* rights. Berkovich made a statement in which he admitted his participation in the scheme and his belief that he was immune from prosecution for mail fraud because he had used a private carrier and not the U.S. Postal Service to send the fraudulent documents.

Berkovich was charged with a single count of mail fraud. His first trial ended in a mistrial after the government mistakenly failed to disclose certain notes reflecting prior statements by a prosecution witness. A second trial ended in a mistrial due to jury deadlock.

The third trial, however, resulted in a conviction. Berkovich relied upon entrapment and a lack of intent as his two primary defenses. In attempting to show a lack of intent to harm anyone, Berkovich claimed that he knew all along that Wroblewski's account was empty and went along with the scheme only because of his fear of Gvozdev. *See United States v. Wallach*, 935 F.2d 445, 461 (2d Cir.1991).

After the jury convicted Berkovich, Judge Koeltl sentenced him to 24 months incarceration to be followed by three years supervised release, plus a $5,000 fine and a mandatory $50 special assessment. This appeal followed.

## DISCUSSION

Berkovich contends first that the court improperly gave a "no ultimate harm" instruction that may have caused the jury to ignore his defense that he knew that the targeted account was closed.[1] In this regard, he relies on our recent decision in *United States v. Rossomando*, 144 F.3d 197 (2d Cir.1998), where we held that such an instruction might constitute error. Berkovich did not object to the instruction in the district court, and we, like the *Rossomando*

---

1. The instruction stated:
 In considering whether or not the defendant acted in good faith, you are instructed that a belief by the defendant, if such a belief existed, that ultimately everything would work out so that no one would lose any money does not require a finding by you that the defendant acted in good faith. No amount of honest belief on the part of the defendant that the scheme would not cause a loss for investors will excuse fraudulent actions or false representations by him to obtain money or property.

panel, review the instruction only for plain error. *See id.* at 200. Because this case differs from *Rossomando* in three critical respects, we hold that the challenged instruction was not plain error.

First, the language of the instant instruction was different from the one at issue in *Rossomando.* While the actual "no ultimate harm" language was virtually identical in both cases, immediately after using this language in the present case, the district court explained what it meant:

> As a practical matter, then, in order to sustain the charges against the defendant, the government must establish beyond a reasonable doubt that he knew that his conduct as a participant in the scheme was calculated to deceive and,nonetheless, he associated himself with the alleged fraudulent scheme *for the purpose of causing some loss to another.*

(emphasis added). Unlike *Rossomando,* the instruction here clearly informed the jury that they could not convict appellant unless he intended to cause loss to someone. That this instruction immediately followed the "no ultimate harm" language also reduces the impact of that language. *See id.* at 202 (fact that instruction "came toward the end of the charge only exacerbated the problem"). The possibility of confusion that troubled us in *Rossomando* was, therefore, greatly reduced by this proper restatement of the law.

Second, a factual predicate existed to give a "no ultimate harm" instruction in this case. *See id.* (finding "insufficiently clear predicate for the 'no ultimate harm' instruction"). Berkovich was recorded as stating on at least two occasions that only the insurance company and not the client or the bank would lose any money. The fact that he intended to harm only the insurance company is no defense to mail fraud, and an instruction indicating that to the jury is not clearly improper. Unlike *Rossomando,* therefore, where the "no ultimate harm" instruction possibly vitiated the sole defense, there was a legitimate reason here for the trial court to indicate to the jury that some of Berkovich's statements regarding who would be harmed did not constitute a defense.

Finally, the jury in *Rossomando* was clearly troubled by the issue of intent and requested the court to clarify its instructions on this point. As we noted in that case, this was the "surest signal that the jurors were indeed confused." *Id.* No such signal was sent in this case. We were also troubled in *Rossomando* by the district court's attempt to clarify its instruction, which failed to resolve the outstanding confusion as to what the government was required to prove. *See id.* at 203. Because of these distinctions, *Rossomando* is not controlling and the instructions here did not constitute plain error.

Berkovich next argues that statements he made following his arrest should have been suppressed because, *inter alia,* the waiver of his *Miranda* rights was the product of coercion. We believe that the statements were voluntary for substantially the reasons stated by the district court. *See United States v. Berkovich,* 932 F.Supp. 582, 586–89 (S.D.N.Y. 1996).

 Appellant next argues that the representation of his trial counsel was constitutionally ineffective. For this claim to succeed, he must demonstrate that his counsel's performance fell below an objective standard of reasonableness and that, but for the deficiency, the likely outcome of the trial would have been different. *See Strickland v. Washington,* 466 U.S. 668, 687–96, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Mason v. Scully,* 16 F.3d 38, 42 (2d Cir.1994). However, actions or omissions that "might be considered sound trial strategy" do not constitute ineffective assistance. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (internal quotation marks omitted).

Appellant's principal contention focuses on the consequences of trial counsel's agreeing to a global stipulation regarding Gvozdev. The facts necessitating the global stipulation arose from the government's discovering, after Gvozdev had testified at the first trial, that he had submitted false documents to the Immigration and Naturalization Service and had lied to obtain a mortgage and credit card. Although Gvozdev stated that he would still testify, he also announced that he would assert his Fifth Amendment privilege against self-incrimination if asked about

these issues. The government, therefore, decided not to call him as a witness. The parties then reached a stipulation in which, *inter alia,* the government and the defense agreed to the admissibility of tapes and transcripts involving conversations between Berkovich and Gvozdev. This stipulation was employed, in almost identical form, at the second and third trials.

Appellant claims that the stipulation permitted the introduction of inadmissible hearsay in Gvozdev's statements on the tapes and transcripts. It seems, however, quite probable that the comments of Gvozdev on these tapes would have been admissible for the purpose of making Berkovich's comments intelligible. *Cf. United States v. Sorrentino,* 72 F.3d 294, 298 (2d Cir.1995). More importantly, even if some of the taped statements were not admissible, the decision to stipulate to the admission of the material must be examined in the context of the global stipulation. While appellant made certain concessions in this agreement, he also gained certain advantages. For example, the jury was informed of Gvozdev's background, evidence that would probably have been otherwise inadmissible because it went only to Gvozdev's credibility and he was no longer a witness. Indeed, in Berkovich's second trial, defense counsel was able to benefit from the global stipulation to obtain a mistrial. The decision to strike a deal was, therefore, part of a reasonable trial strategy. *See Strickland,* 466 U.S. at 690, 104 S.Ct. 2052; *United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir.1987).

■ Appellant also focuses on the failure to object to testimony by Agent Garfinkel recounting his conversations with Gvozdev. Garfinkel testified that, according to Gvozdev, Berkovich first contacted Gvozdev about the "alleged fraud" in March 1995. Even if Agent Garfinkel should have used a different phrase, the relevance of the testimony went not to the fraudulent nature of the scheme but to the fact that Berkovich first contacted Gvozdev about that scheme, thereby undermining the entrapment defense. Appellant does not dispute that a description of these contacts was admissible, and, had Garfinkel otherwise described the encounter, there is

no reasonable probability that the trial's outcome would have been different. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052.

■ Appellant's additional claims regarding his trial counsel's performance are equally unavailing. He claims, *inter alia,* that counsel failed to: (i) object to the government's summation, (ii) file a Rule 29 motion, (iii) request a limiting instruction, stating that Gvozdev's taped statements should not be considered for their truth, and (iv) object to the "no ultimate harm" instruction. The first two claims are without merit as the objection and motion would have failed. As to the third point, while the limiting instruction regarding Gvozdev's comments might have been granted, Berkovich has made no showing that a limiting instruction would have created a reasonable probability that the outcome of the trial would have been different. *See id.* Finally, even if an objection to the "no ultimate harm" instruction would have led Judge Koeltl to alter the instruction, this failure to object, prior to our decision in *Rossomando,* was not below an objective standard of reasonableness. Indeed, as noted above, it is anything but clear that *Rossomando* would preclude such a charge in the precise circumstances of this case. Even were the two decisions that were arguably errors—the failure to strike the phrase "alleged fraud" and to request a limiting instruction—"corrected," a reasonable probability that the outcome of the trial would have been altered does not exist, and the requirements of *Strickland* are, thus, unsatisfied.

■ Appellant's final contention is that the government's actions were so outrageous as to violate his Fifth Amendment due process rights. Berkovich failed to raise this claim below, and it is thus waived. *See, e.g., United States v. Keppler,* 2 F.3d 21, 23 (2d Cir. 1993).

■ Even were we to consider this contention, it would be unavailing. Courts have noted that certain government conduct could be "'so outrageous' that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction," *United States v. Schmidt,* 105 F.3d 82,

91 (2d Cir.1997) (quoting *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973)), *cert. denied,* —— U.S. ——, 118 S.Ct. 130, 139 L.Ed.2d 80 (1997), but have almost never found such a violation. *See United States v. LaPorta,* 46 F.3d 152, 160 (2d Cir.1994) (finding only one case where a circuit court has found such conduct since 1976). In this case, the government's evidence indicated that the criminal plan originated with Berkovich, and when government agents "do no more than facilitate a criminal enterprise ... due process principles are not violated." *Schmidt,* 105 F.3d at 92.

We therefore affirm.