UNITED STATES of America, Appellee,

v.

Myung S. KOH, Defendant–Appellant.

Docket Nos. 99–1034, 99–1036.

United States Court of Appeals, Second Circuit.

Argued: Aug. 23, 1999.

Decided: Nov. 10, 1999.

Samuel Weissman, New York, NY, for Defendant–Appellant.

Roland G. Riopelle, Assistant United States Attorney for the Southern District of New York, New York, N.Y. (Mary Jo White, United States Attorney, Stephen J. Ritchin, Lewis J. Liman, Baruch Weiss, Assistant United States Attorneys, of counsel), for Appellee.

Before: KEARSE, CALABRESI, and STRAUB, Circuit Judges.

STRAUB, Circuit Judge:

Defendant Myung S. Koh appeals from judgments entered following two separate jury trials in the United States District Court for the Southern District of New York: the first filed on January 14, 1999, after a trial on indictment S2 96 Cr. 82, before Miriam G. Cedarbaum, *Judge*, convicting him of one count of conspiracy to

submit false loan applications to the Bank of Seoul, in violation of 18 U.S.C. § 371 ("bank fraud case"); the second, also filed on January 14, 1999, after a trial on indictment S2 97 Cr. 170, before Sidney H. Stein, *Judge*, convicting him of one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371, § 1014, and six counts of mail fraud, in violation of 18 U.S.C. § 1341 ("mail fraud case"). On appeal, Koh contends among other things that: (1) 18 U.S.C. § 1014 ("the false statements statute") is inapplicable to fraudulent loan applications submitted to a United States agency of a foreign bank that is neither federally chartered nor federally insured; (2) his prosecution for mail fraud was vindictively motivated; (3) the District Court's charge was misleading and confusing to the jury; and (4) the District Court's calculation of the "loss" attributable to him under the Sentencing Guidelines was erroneous.

We hold that the false statements statute is applicable to fraudulent loan applications submitted to a United States agency of a foreign bank that is not federally chartered or federally insured. Finding Koh's additional claims to be meritless, we affirm his conviction.

## BACKGROUND

As the details of the crimes of which Koh was convicted, as well as the evidence on which those convictions were based, are not relevant to the issues raised on appeal, we set forth only a brief procedural and factual background.

On July 14, 1997, Koh proceeded to trial on the redacted version of Count Four of indictment S2 96 Cr. 82, which charged him with conspiring to submit false loan applications to the Bank of Seoul, a New York agency of a foreign bank. These charges arose from Koh's submission of approximately twelve applications for letters of credit to the Bank of Seoul on behalf of a series of companies owned and controlled by Koh. The letters described fictitious transactions engaged in by the

companies, which were suffering serious financial problems and were unable to repay loans from the Bank of Seoul. The false documentation served as the basis for the Bank of Seoul's issuance of checks to Koh's companies, which were in turn deposited in a second bank. At the same time, Koh obtained another check from the second bank in the same amount as that deposited, which he then used to repay the Bank of Seoul on another letter of credit that was then due to be paid by one of his companies. In this manner, Koh's companies were able to obtain credit from the Bank of Seoul when they were in fact insolvent. On July 16, 1997, the jury returned a verdict of guilty on that count, finding that Koh had conspired with others to submit false loan applications to the Bank of Seoul in 1990–1991.

On January 20, 1998, Koh and two of his co-defendants proceeded to trial on the conspiracy and substantive mail fraud charges contained in the S2 97 Cr. 170 indictment. The government offered substantial testimony and documentary proof showing that Koh and others conspired to operate a business, Korbean International Investment Corporation ("KIIC"), fraudulently between the Spring of 1992 and February 1995. In particular, the government offered evidence that Koh and his co-conspirators induced persons to invest in accounts controlled by KIIC, a company that had been essentially insolvent from the Fall of 1992 forward. In fact, Koh had signed a consent judgment drafted by the Commodities Futures Trading Commission ("CFTC"), agreeing to shut down KIIC's operations in December 1994. On February 11, 1998, the jury returned a verdict of guilty on all counts.

Following the mail fraud trial, Koh moved for a judgment of acquittal or, alternatively, for a new trial arguing, *inter alia*, that this Court's decision in *United States v. Rossomando*, 144 F.3d 197 (2d Cir.1998), held that instructions such as those given to his jury were misleading and confusing. The District Court denied

that motion, finding that there was a factual predicate for the charge given.

Following Koh's convictions on both indictments, the District Court ordered that the two indictments be consolidated for purposes of sentencing. After two lengthy sentencing hearings, the District Court sentenced Koh at the bottom end of the applicable Sentencing Guidelines to a term of seventy months' imprisonment, followed by a three-year term of supervised release, a special assessment of $400 and restitution of $7,600,000, for his convictions on both indictments. On January 14, 1999, following a remand by this Court for the correction of technical errors, the District Court entered amended judgments of conviction.

This timely appeal followed.

## DISCUSSION

### I. *Application of the False Statements Statute*

■ We review questions of statutory interpretation *de novo*, and begin with the language of the statute. *See United States v. Figueroa*, 165 F.3d 111, 114 (2d Cir. 1998).

■ The conspiracy of which Koh was convicted in the bank fraud trial centered on the substantive crime of submission of false loan applications to the Bank of Seoul under 18 U.S.C. § 1014, which provides in pertinent part:

Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of . . . a branch or agency of a foreign bank (as such terms are defined in paragraphs (1) and (3) of section 1(b) of the International Banking Act of 1978) . . . upon any application,

advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan . . . shall [be guilty of a crime].

The reference to "a branch or agency of a foreign bank," was added to § 1014 as part of the Crime Control Act of 1990, Pub.L. No. 101–647, § 2597(i), 104 Stat. 4789, 4910 (1990) (codified as amended in scattered sections of U.S.C.).[1] Paragraph 1 of section 1(b) of the International Banking Act ("IBA"), 12 U.S.C. §§ 3101–11, in turn defines "agency" as:

any office or any place of business of a foreign bank located in any State of the United States at which credit balances are maintained incidental to or arising out of the exercise of banking powers, checks are paid, or money is lent but at which deposits may not be accepted from citizens or residents of the United States.

12 U.S.C. § 3101(1). Finally, paragraph 3 of that section defines the term "branch" as "any office or any place of business of a foreign bank located in any State of the United States at which deposits are received." 12 U.S.C. § 3101(3).

The Bank of Seoul is, indisputably, a United States agency of a foreign bank that is neither federally chartered nor federally insured, and Koh argues, as he did before the District Court, that § 1014 does not address fraudulent loan applications submitted to such institutions. We disagree.

■ It is well-settled that "[w]hen the language of the statute is clear and does not contradict a clearly expressed legislative intent, our inquiry is complete and the language controls." *United States v. Kinzler*, 55 F.3d 70, 72 (2d Cir.1995); *see also Harrison v. PPG Indus., Inc.*, 446 U.S.

---

**1.** At the same time, Congress similarly expanded the definition of "financial institution" contained in 18 U.S.C. § 20, and expanded the reach of a number of other statutes designed to protect various banks to include "a branch or agency of a foreign

bank (as such terms are defined in paragraphs (1) and (3) of section 1(b) of the International Banking Act of 1978)." *See* Pub.L. No. 101–647, § 2597(a), 104 Stat. 4789, 4908 (1990).

578, 592, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980) ("[I]t would be a strange canon of statutory construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of a statute."). Here, the statute at issue unambiguously applies to a "branch" or "agency" as defined in the IBA. The IBA, in turn, defines branch or agency by the term "any," with no limitations. Thus, there is no ambiguity in the definition of "agency" or "branch" to justify exclusion of those institutions that are not federally chartered or federally insured. *See Salinas v. United States,* 522 U.S. 52, 57, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) ("word 'any' ... undercuts the attempt to impose this narrowing construction"); *Tambe v. Bowen,* 839 F.2d 108, 110 (2d Cir.1988) ("'Any' means without restriction or limitation." (quoting *Edwards v. McMahon,* 834 F.2d 796, 799 (9th Cir. 1987))).

In addition to the plain language of the false statements statute, its statutory scheme as a whole supports the interpretation put forth by the government. *See Holloway v. United States,* 526 U.S. 1, 119 S.Ct. 966, 969–71, 143 L.Ed.2d 1 (1999) (statutory language, case law, and the overall statutory scheme support Court of Appeals's interpretation of statute's scope); *Aircraft Mechanics Fraternal Assoc. v. Atlantic Coast Airlines, Inc.,* 55 F.3d 90, 94 (2d Cir.1995) ("An individual section of a statute should not be interpreted in isolation but as part of the entire statutory scheme."). In § 1014, Congress also made it a crime to submit a false loan application to "any institution the accounts of which are insured by the Federal Deposit Insurance Corporation." 18 U.S.C. § 1014. Adopting Koh's reading would make the addition of references to branches and agencies of foreign banks superfluous if Congress had intended those terms to be limited to institutions already covered by the statute. *See United States v. Anderson,* 15 F.3d 278, 283 (2d Cir.1994) (citing canon of construction that courts will avoid statutory interpretations that render provisions superfluous).

Further, the IBA separately defines, by reference to 12 U.S.C. § 3102, "Federal branch" and "Federal agency" as branches and agencies of foreign banks that are federally chartered and federally insured. *See* 12 U.S.C. §§ 3101(5), (6). Similarly, the IBA separately defines "State branch" and "State agency" as branches and agencies of foreign banks that are established and operating under the laws of any State. 12 U.S.C. §§ 3101(11), (12). Thus, Congress could have simply referred in the false statements statute to §§ 3101(5) and (6), had it meant to limit its reach to federally-chartered and/or federally-insured agencies or branches.

■■■■ Koh argues, nonetheless, that § 1014 should not be construed according to its plain meaning because "[a]mbiguity in congressional intent" is evident in the fact that neither the legislative history, nor the debates surrounding the passage of the Crime Control Act of 1990, explicitly address the addition of foreign banks to § 1014. However, the absence of discussion of the amendment, *see Williams v. United States,* 458 U.S. 279, 288, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) (noting that the amendments adding institutions to § 1014's list "attracted little attention in Congress and were dealt with summarily"), does not advance Koh's argument. The "strong presumption that the plain language of the statute expresses congressional intent" can only be rebutted "when a contrary legislative intent is clearly expressed." *Ardestani v. INS,* 502 U.S. 129, 135–36, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991) (internal quotation marks and citations omitted). The fact that Koh cannot point to any affirmative statements expressing a congressional intent that would be defeated by giving literal meaning to the statute is fatal to his argument. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) ("Absent a clearly expressed legislative intention to

638

the contrary, [statutory] language must ordinarily be regarded as conclusive.").

 Koh also relies on what he characterizes as clear, contrary legislative intent, expressed in the history of the bank fraud statute, 18 U.S.C. § 1344.[2] Initially, we agree that the legislative history of the bank fraud statute informs our understanding of the purpose and meaning of the false statements statute. *Cf. United States v. Brandon*, 17 F.3d 409, 425 n. 13 (1st Cir.1994) ("We find the language of § 1014 sufficiently similar to § 1344 to warrant a similar conclusion about Congress'[s] intent with respect to the knowledge requirement in the bank fraud statute."). Moreover, it is true, as Koh argues, that with the passage of the bank fraud and false statements statutes, Congress clearly intended to protect "the financial integrity" of institutions in which it had a strong federal interest, including those that are "federally created, controlled or insured." S.Rep. No. 98–225, at 377 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3517; *see also id.* ("The need for Federal jurisdiction over crimes committed against federally insured and controlled financial institutions has been recognized by the Congress in its passage of statutes specifically reaching crimes of embezzlement, robbery, larceny, burglary, and false statement directed at these banks."); *United States v. Rodriguez*, 140 F.3d 163, 168 (2d Cir. 1998) ("The [bank fraud statute's] requirement that the defendant must have intended to victimize a federally insured financial institution by exposing it to actual or potential loss arises from the statute's purpose of protecting the federal government's interest, as an insurer of financial institutions, and not others who may have been fraudulently induced to write checks." (citing *United States v.*

*Davis*, 989 F.2d 244, 246–47 (7th Cir. 1993))).

The federal interest of protecting only federally-insured or controlled *domestic* banks is not hindered, however, by the government's reading of the 1990 amendments to include agencies of *foreign* banks that are not federally insured or federally chartered. By its reference to the IBA in the false statements and the bank fraud statutes, Congress expressed an *additional* federal interest in regulating all agencies and branches of foreign banks, at least in some respects. The legislative history of the IBA acknowledges that prior to its enactment, "all foreign banks operating branches or agencies in the United States [did] so under State authority." S.Rep. No. 95–1073, at 6 (1978), *reprinted in* 1978 U.S.C.C.A.N. 1421, 1426. With the IBA, Congress intended to regulate all branches and agencies of foreign banks because of "[t]he growth in number and size of foreign banking operations, and their ever-increasing importance to the structure of the banking system and to the functioning of money and credit markets." S.Rep. No. 95–1073, at 2, *reprinted in* 1978 U.S.C.C.A.N. at 1422. Through such regulation, Congress hoped to eliminate "competitive advantages" of foreign banks operating in the U.S. over domestic banks. *Id.*

Thus, while Congress may decide that its federal interest in regulating domestic state banks is present only if those banks are federally "created, controlled or insured," S.Rep. No. 98–225, at 377, *reprinted in* 1984 U.S.C.C.A.N. at 3517, so too may it determine, as the IBA reflects, that it has a strong federal interest in regulating the activities of all foreign banks in the U.S. In addition to the expansion of § 1014 and § 1344, Congress expressed that federal interest by extending regulatory au-

**2.** Title 18, section 1344 of the United States Code states in relevant part:

Whoever knowingly executes, or attempts to execute, a scheme or artifice-(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises [shall be guilty of a crime].

18 U.S.C. § 1344.

thority over operations of foreign banks in the United States in several respects. Under the IBA, for example, the Federal Reserve has "residual examining authority over *all* banking operations of foreign banks," S.Rep. No. 95–1073, at 13, *reprinted in* 1978 U.S.C.C.A.N. at 1433 (emphasis added); *see also United States v. Lewis,* 67 F.3d 225, 231 (9th Cir.1995), and all branches and agencies of foreign banks operating in the United States are subject to the Bank Holding Company Act of 1956, 12 U.S.C. §§ 1841–50, *see* 12 U.S.C. § 3106(a), and the federal antidiscrimination laws, *see* 12 U.S.C. § 3106a. Therefore, although it differentiates between state and federal branches of foreign banks, *see, e.g.,* 12 U.S.C. § 3102a(1)(B), the IBA recognizes a sufficient federal interest to apply, at times, to both.

■ Finally, even if we were to accept Koh's final argument that his interpretation of § 1014 would not violate any canons of statutory interpretation, this would not help Koh, for Koh cannot base an interpretation of a statute solely on the fact that the legislative history and rules of statutory construction do not prohibit the interpretation he advocates. *See Anderson v. Conboy,* 156 F.3d 167, 178 (2d Cir.1998) (in " 'rare and exceptional circumstances' such as where a contrary legislative intent is clearly expressed, we may deviate from a statute's plain language to avoid defeating that clear intent"), *cert. granted,* —— U.S. ——, 119 S.Ct. 1495, 143 L.Ed.2d 650, *and cert. dismissed,* —— U.S. ——, 119 S.Ct. 2418, 144 L.Ed.2d 789 (1999).

In sum, Congress expressed a clear objective in the IBA, which is incorporated by reference in § 1014 and § 1344, to regulate foreign banking operations because of their importance in the overall market, regardless of whether those branches or agencies are federally insured or federally chartered. Moreover, there is no explicit legislative policy that would be violated if we assume from the plain language of Congress's 1990 amendment to § 1014 that

it broadened the statute in this arena to include state-chartered branches and agencies of foreign banks that are not federally insured.

## II. *Vindictive Prosecution*

Koh argues, as he did in the District Court, that his prosecution on the KIIC bank fraud charges was vindictively motivated because it was initiated by the U.S. Attorney's Office only after a former Assistant U.S. Attorney and court-appointed receiver for KIIC brought Koh's KIIC-related fraud to the attention of the Office. Though the New York State Attorney General's Office and the CFTC had been investigating KIIC since 1994, the United States Attorney's Office did not begin actively pursuing its investigation of KIIC until 1996.

■ We review a district court's factual findings regarding prosecutorial vindictiveness for clear error and its legal conclusions are reviewed *de novo. See United States v. Johnson,* 171 F.3d 139, 140 (2d Cir.1999).

■ A vindictive motive for a prosecution "will be found where there is direct evidence of actual vindictiveness, or a rebuttable presumption of a vindictive motive may arise under certain circumstances." *United States v. White,* 972 F.2d 16, 19 (2d Cir.), *cert. denied,* 506 U.S. 1026, 113 S.Ct. 669, 121 L.Ed.2d 593 (1992). Koh does not appear to base his claim on a presumption of vindictiveness, nor could he. We have previously held that the presumption of prosecutorial vindictiveness generally does not arise in the pretrial setting, *see, e.g., United States v. Hinton,* 703 F.2d 672, 678 (2d Cir.), *cert. denied,* 462 U.S. 1121, 103 S.Ct. 3091, 77 L.Ed.2d 1351 (1983), or in the subsequent shift from a state to a federal prosecution, *see Johnson,* 171 F.3d at 142 (The "shift from state to federal jurisdiction is commonplace" and, therefore, not subject to a presumption of prosecutorial vindictiveness). Thus, Koh is not entitled to a pre-

sumption of vindictiveness in the circumstances present here, where the decision to prosecute him for bank fraud arose pretrial and where the prosecution merely shifted from state to federal jurisdiction.[3] Koh therefore must demonstrate actual vindictiveness, which requires "direct" evidence, such as a statement by the prosecutor evidencing the vindictive motive. *See United States v. Goodwin*, 457 U.S. 368, 380–81 & nn.12, 384 & n. 19, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982).

■ In order to prevail on his claim, Koh must show that "(1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse,' and (2) he would not have been prosecuted except for the animus." *United States v. Aviv*, 923 F.Supp. 35, 36 (S.D.N.Y.1996) (internal citations omitted).

■ We conclude that the District Court, after reviewing the record and hearing lengthy oral argument, did not exceed the bounds of its allowable discretion in finding that Koh had not made an adequate showing that the KIIC receiver ultimately prevailed upon the U.S. Attorney's Office to seek an indictment for bank fraud. *See United States v. Monsoor*, 77 F.3d 1031, 1035 (7th Cir.1996) (defendant must show that the investigating agency in some way ultimately prevailed upon the prosecutor making the decision to seek an indictment).

Koh emphasizes one exchange in particular in the record before the District Court as evidence of an improper motive. At a detention hearing following Koh's arrest in January 1996, the Magistrate Judge inquired about the government's somewhat sudden interest in Koh's allegedly fraudulent KIIC activities, when at least one member of the U.S. Attorney's office knew about those activities earlier on. The Assistant United States Attorney at that hearing responded that "[w]hat happened, Your Honor ... is the receiver, ... an alumnus of the office, came into the office very recently and made a big noise." The Magistrate Judge responded, "[w]ell, he's a big man." The AUSA responded, "Right. And he made a big noise, in a word."

That the former prosecutor and KIIC receiver may have been responsible for bringing KIIC's assertedly fraudulent activities to the attention of the U.S. Attorney's Office is insufficient to sustain Koh's claim. Arguably, the receiver had a duty to report Koh's allegedly criminal activity to the appropriate authorities, *see* 18 U.S.C.A. § 4, and the allegations that he was motivated by personal financial gain,[4] are irrelevant.

We agree with the District Court, that as an officer of the court, the receiver was not an agent of the U.S. Attorney's Office, and that, even if we were to assume that he was a quasi-investigator for "the government," there was no evidence that the decision to prosecute was the result of his allegedly improper motives. *See United States v. Hastings*, 126 F.3d 310, 314 (4th Cir.1997) (same), *cert. denied*, 523 U.S. 1060, 118 S.Ct. 1388, 140 L.Ed.2d 648 (1998); *United States v. Dickerson*, 975 F.2d 1245, 1251 (7th Cir.1992) (actions of an investigating agency are not automatically imputed to a federal prosecutor), *cert. denied*, 507 U.S. 932, 113 S.Ct. 1316, 122 L.Ed.2d 703 (1993).

---

3. Though the CFTC was a party to Koh's consent decree, signed with the State Attorney General's Office, it explicitly designates the State Attorney General as the prosecuting entity. The subsequent shift of that prosecution by the state does not give rise to the "realistic likelihood," *Johnson*, 171 F.3d at 141–42, of prosecutorial vindictiveness.

4. Koh argues that the receiver approached the government about KIIC in order to pressure Koh into testifying against the Bank of Seoul in a RICO claim against the Bank, for which the receiver's law firm was being paid on an hourly rate and would receive statutory attorneys' fees.

The decision to prosecute Koh was based on investigations conducted by the State Attorney General's Office before the receiver even approached the U.S. Attorney's Office, and on an independent investigation by the U.S. Attorney's Office lasting six months. In short, the District Court did not err in finding that there was no evidence that the receiver had influenced the government's decision to prosecute Koh.

### III. *Good Faith Instruction*

Koh's defense at the mail fraud trial was that, although he engaged in much of the conduct charged in the indictment, he lacked the requisite intent, *i.e.*, he intended to ultimately pay back the money KIIC took from its investors. The District Court's charge included an instruction on the good faith defense stating, *inter alia*, that in considering whether or not a defendant acted in good faith,

> you are instructed that a belief by [the] defendant, if such belief existed, that ultimately everything would work out so that no one would lose any money or property does not warrant a finding by you that [the] defendant acted in good faith. No amount of honest belief on the part of the defendant that the scheme would ultimately make a profit for investors, will excuse fraudulent actions or false representations by him to obtain money or property.

We review the District Court's charge for "plain error" because Koh did not object to the "no ultimate harm" language in the proposed jury instruction. Koh argues that *United States v. Rossomando*, 144 F.3d 197 (2d Cir.1998), in which we found plain error in "no ultimate harm" language in a jury charge in a mail fraud conviction, is applicable here. However, the instant case is easily distinguished from *Rossomando* and, in fact, is more akin to our more recent holding in *United States v. Berkovich*, 168 F.3d 64 (2d Cir.1999), *cert. denied*, — U.S. —, 120 S.Ct. 127, 145 L.Ed.2d 107 (1999),

where we found no basis for reversal of a mail fraud conviction despite the use of the "no ultimate harm" language.

First, the District Court charged the precise language that we held in *Berkovich* "clearly informed the jury that they could not convict [the defendant] unless he intended to cause loss to someone," and reduced the fear of confusion to the jury that concerned us in *Rossomando*. 168 F.3d at 67. Second, as in *Berkovich*, a factual predicate existed for the "no ultimate harm," instruction in this case. *See id.* Finally, notwithstanding the jury's request for clarification of the word "obtain," we are not concerned that the jury was confused because there was a factual predicate for the charge. The court had already fulfilled its obligation to make clear that the jury could only convict if it found the requisite intent, and the court was correct to simply define "obtain" "as it is normally used."

Thus, there was no error in the charge, plain or otherwise.

### IV. *Sentencing Claim*

At sentencing, both parties raised a series of issues related to the calculation of "loss" attributable to Koh under the Sentencing Guidelines. The government argued that the loss in the two cases was between $10 and $20 million, resulting in an offense level of 27, while Koh argued that it was between $1.5 and $2.5 million, due mainly to a series of offsets that Koh argued should apply, resulting in an offense level of 25. After two lengthy sentencing hearings, the District Court rejected the offsets and calculated the loss as over $12 million and the offense level as 27, and sentenced Koh at the bottom end of the applicable guideline range.

The District Court specifically stated that, even if it were wrong about the offsets and the actual loss was limited to the amount of money spent without permission, *i.e.*, $4.378 million, it would have imposed the same sentence, "given the ex-

treme seriousness of the offense," which "truly was a massive financial conspiracy, massive commingling."

 We review legal interpretations of the Sentencing Guidelines construing the term "loss" *de novo* and review factual findings supporting the court's offense calculation under a clearly erroneous standard. *United States v. Jacobs*, 117 F.3d 82, 95 (2d Cir.1997). *United States v. Carrozzella*, 105 F.3d 796 (2d Cir.1997), is dispositive of Koh's claims regarding the offsets. Thus, his claims fail because they all involved money that was "necessary for the scheme to continue." *Id.* at 805 (explaining why "loss in fraud cases includes the amount of property taken, even if all or part has been returned"); *accord United States v. Mucciante*, 21 F.3d 1228, 1238 (2d Cir.), *cert. denied*, 513 U.S. 949, 115 S.Ct. 361, 130 L.Ed.2d 315 (1994).

 Finally, even if the District Court's decision not to apply the offsets was error, it is well established that "disputes about applicable guidelines need not be resolved where the sentence falls within either of two arguably applicable guideline ranges and the same sentence would have been imposed under either guideline range." *United States v. Bermingham*, 855 F.2d 925, 931 (2d Cir.1988). As evidenced by the District Court's statements, such is the case here and Koh would have received the same sentence regardless of whether the offsets were included.

## CONCLUSION

We have reviewed all of Koh's remaining arguments on appeal and find them to be without merit. For the foregoing reasons, we affirm the judgments of the District Court.