86 F.3d 277
 UNITED STATES of America, Appellee,
v.
Richard DINOME; Ronald Ustica; Paul Castellano; Anthony
Gaggi; Joseph Testa; Patrick Testa; Henry Borelli; Peter
La Froscia; Anthony Senter; Judith May Hellman; Sol
Hellman; Paul Dodal; Richard Mastrangelo, also known as
Richie; Ronald Turekian; Herman Weisberger; Edward
Rendini; Joseph Guglielmo; Douglas Rega; Luis Pedro
Rodriguez; Gus Kalevas; Salvatore Mangialino; Carlo
Profeta, also known as Carlos, also known as Carmello;
Dennis Testa; Abdullah Mohammad Hussain, also known as The
Arab, Abdullah Mohammad Hassan Hussain, Defendants,
Wayne Hellman, Defendant-Appellant.
 No. 586, Docket 94-1476.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 16, 1995.
Decided June 11, 1996.
 
 Jeremy Gutman, New York City (Mark L. Freyberg, New York City, of counsel), for Defendant-Appellant.
 Patrick J. Smith, Assistant United States Attorney for the Southern District of New York, New York City (Mary Jo White, United States Attorney, Nancy J. Northup, Assistant United States Attorney, New York City, of counsel), for Appellee.
 Before OAKES, MAHONEY, and WALKER, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 Defendant-appellant Wayne Hellman appeals from an amended judgment entered August 22, 1994 in the United States District Court for the Southern District of New York, Miriam Goldman Cedarbaum, Judge, upon a jury verdict finding him guilty of one count of mail fraud in violation of 18 U.S.C. § 1341,[1] and one count of wire fraud in violation of 18 U.S.C. § 1343,[2] for making false statements in connection with an application for a residential mortgage.
 
 
 2
 On appeal, Hellman claims that the district court improperly instructed the jury that mail and wire fraud may be established by proof that a defendant defrauded another party of its right to control the use of its assets, and that there was insufficient evidence to support his convictions. We affirm the judgment of conviction.
 
 Background
 
 3
 Hellman was originally prosecuted pursuant to a seventy-eight count, twenty-four defendant indictment of an organized crime group known as the DeMeo crew of the Gambino organized crime family. This indictment charged the defendants with substantive and conspiracy violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c) and (d), which violations included numerous predicate acts of mail and wire fraud. The defendants were also charged with myriad other violations of federal laws. Judge Kevin Thomas Duffy severed non-RICO counts involving auto theft and exportation, see United States v. DiNome, 954 F.2d 839, 842 (2d Cir.), cert. denied, 506 U.S. 830, 113 S.Ct. 94, 121 L.Ed.2d 56 (1992), none of which charged Hellman, to be tried first. The remaining charges were reassigned to Judge Vincent L. Broderick, and the trial of these charges commenced on February 22, 1988.
 
 
 4
 Ten defendants were tried for RICO offenses and the remaining substantive charges. Wayne Hellman and his wife, Judith Hellman, were charged with substantive and conspiracy RICO violations involving predicate acts of accepting bribes and mail and wire fraud, and separate charges of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. Wayne Hellman was also charged with extortion in violation of the Hobbs Act, 18 U.S.C. § 1951. Near the close of the trial, the Hellmans moved pursuant to Rule 29 of the Federal Rules of Criminal Procedure for a judgment of acquittal on the RICO charges, and for a mistrial on the remaining charges on the basis of spillover prejudice. DiNome, 954 F.2d at 844. Judge Broderick granted the Rule 29 motion, but denied the motion for a mistrial.
 
 
 5
 The jury found the Hellmans guilty of mail and wire fraud, and Wayne Hellman guilty of extortion. All codefendants were also found guilty on all charges. Judge Broderick thereafter acquitted Wayne Hellman on the extortion charge pursuant to Rule 29(c), and sentenced him to three years imprisonment, five years probation, and fines totalling $4,000. This Court then reversed the Hellmans' mail and wire fraud convictions because we concluded that they had been prejudiced by the introduction of evidence concerning the RICO charges against them and their codefendants before the RICO counts against them were dismissed. See DiNome, 954 F.2d at 844-45.
 
 
 6
 On remand, the case was reassigned to Judge Cedarbaum, and the Hellmans were each retried on one count of mail fraud and one count of wire fraud in connection with a scheme to defraud a savings and loan institution by making false statements on a residential loan application. The facts, as established at trial and viewed in the light most favorable to the government, see United States v. D'Amato, 39 F.3d 1249, 1256 (2d Cir.1994), are as follows.
 
 
 7
 In 1980, Wayne and Judith Hellman negotiated the purchase of a home in Marlboro Township, New Jersey, for $82,000. To finance this purchase, the Hellmans sought a mortgage from Freehold Savings & Loan Association ("Freehold Savings") in the amount of $50,000. Susan Tarnoff, their real estate broker, assisted the Hellmans in making out this loan application. Tarnoff told them that Freehold Savings required that monthly mortgage payments not exceed twenty-eight percent of an applicant's gross monthly income. It was also required that the applicant make a down payment in the amount of twenty percent of the purchase price. Wayne Hellman assured Tarnoff that he could verify any income that was needed to qualify for the loan. He indicated on the loan application that he received $3,683 per month from his employment at Jersey Seafood. However, the employment verification form received from Jersey Seafood indicated that Hellman earned only $300 per week. This amount failed to satisfy Freehold Savings' income requirement.
 
 
 8
 William Conklin, a loan officer at Freehold Savings, then instructed Tarnoff to contact Hellman to ascertain whether he had any additional income. Tarnoff called Hellman about the matter, and he reported that he did have additional income from his employment at Glenwood Flea Market ("Glenwood"), where he claimed to have been a manager for three years. After Tarnoff verified by telephone that Hellman worked at Glenwood, Freehold Savings received a letter from Glenwood which stated that Hellman was employed as a manager at Glenwood and that his yearly salary was $28,600. At trial, Hellman stipulated that this information was false; i.e., that he had never worked at Glenwood. However, Freehold Savings accepted the information without further inquiry and granted the mortgage loan, which closed on January 28, 1981.
 
 
 9
 At trial, Hellman sought to create a reasonable doubt as to whether he had intended to cause Freehold Savings any legally cognizable harm by misrepresenting his financial status. In this regard, Conklin acknowledged on cross-examination that the Hellmans' $32,000 downpayment constituted forty percent of the residence's purchase price, that the house was appraised at over $80,000, and that Freehold Savings' first lien on the property would protect it against any loss in the event of default.
 
 
 10
 Hellman also blamed Tarnoff for the submission of false information about his income. He testified, inter alia, that his wife was not present when he filled out the loan application with Tarnoff. He claimed that he had told Tarnoff that he earned $850 per week, but she had mistakenly recorded this amount as his monthly income. In addition, Hellman asserted that when his application was initially rejected, Tarnoff suggested to Hellman that his father, who owned Glenwood, "put him on the books" at Glenwood, and that she would verify his employment at Glenwood and inform Freehold Savings accordingly. These claims contradicted Tarnoff's trial testimony. On cross-examination, Hellman admitted that at the time he had applied for the loan he only expected to earn $15,000 per year, not $850 per week, which would have amounted to approximately $44,000 per year. He also conceded that he had listed Glenwood as an employer on an entirely separate credit application in 1981, thereby discrediting his claim that submitting false information about his purported employment at Glenwood to Freehold Savings was Tarnoff's idea.
 
 
 11
 The Hellmans submitted a joint request to charge the jury on the elements of mail and wire fraud in accordance with the instructions in 1A Leonard B. Sand et al., Modern Federal Jury Instructions, with several additions. First, the defendants requested the following instruction on the scheme to defraud element:
 
 
 12
 You must distinguish here between a scheme to defraud and a scheme to deceive. A scheme to defraud must have as its goal a financial loss to the victim. A scheme to deceive is one in which false statements are made to induce a party to enter a transaction but the result is, for example, the delivery of goods of appropriate value for the price paid.
 
 
 13
 The district court rejected this proposal, and instead instructed the jury as follows:
 
 
 14
 The fraudulent representation must relate to a material fact. A material fact is one which would reasonably be expected to be of concern to a prudent person in making a decision.
 
 
 15
 This means that if you find a particular representation to have been false, you must determine whether that representation was one that a reasonable person might have considered important in making a decision.
 
 
 16
 The government must prove that the defendant you are considering contemplated harm in order to establish a scheme to defraud.
 
 
 17
 Second, the Hellmans requested the following instruction regarding good faith:
 
 
 18
 In considering whether a defendant acted in good faith you may consider proof of repayment made prior to any charges being brought. You may also consider any testimony to the effect that the alleged victim was satisfied as to the outcome of the transaction.
 
 
 19
 The court declined to give this instruction to the jury, instead charging that:
 
 
 20
 In considering whether or not the defendant you are considering acted in good faith, you are instructed that a belief by that defendant, if such a belief existed, that ultimately everything would work out so that no one would lose any money does not require a finding by you that the defendant acted in good faith. No amount of honest belief on the part of the defendant you are considering that no one will lose any money will excuse fraudulent actions or false representations to obtain money.
 
 
 21
 The Hellmans also requested a charge concerning their theory of defense that included the following:
 
 
 22
 [B]oth Judith May Hellman and Wayne Hellman argue that since they put up thirty two thousand dollars of their own money, and since they made good faith efforts to make payments on the mortgage and since the bank was secured by both an existing insurance policy and any loss due to its superior lien on the property, they could not have possibly intended any harm to the Freehold Savings Bank.
 
 
 23
 The district court did not adopt this instruction, but instead charged the jury as follows with respect to intent to defraud:
 
 
 24
 "Intent to defraud" means to act knowingly and with the specific intent to deceive for the purpose of causing some financial or property loss to another. The government is not required to prove that anyone was actually defrauded to establish a violation by the defendant you are considering. No actual pecuniary injury need result to the victim of the fraud.
 
 
 25
 Under the mail fraud statute, the definition of property includes intangible property interests such as the right to control the use of one's own assets. This interest is injured when a person is deprived of information he would consider valuable in deciding how to use his assets.
 
 
 26
 At the charging conference, defense counsel never took specific exception to any of the instructions that the court proposed to, and subsequently did, deliver to the jury. However, Judith Hellman's counsel, David Cooper, contended in general terms that Freehold Savings "never lost ... control of their money.... The control of the money never was with the Hellmans and the bank never lost it." The following colloquy ensued:
 
 
 27
 THE COURT: They're not in control because unless there was a default on the mortgage, the bank did not have that money available. It couldn't lend it to someone else, for example, who was in truth, who actually had met its [loan] standard.
 
 
 28
 MR. COOPER: What I'm suggesting is that loss of control--I still believe that no matter what the cases may say, that even if we have to accept a loss of control is the harm contemplated, it must be a loss of control that must have some sort of meaning. And I can understand that when a depositor gives money to a bank and then runs off with that money and do whatever they want with it, they've really lost control of that money. When a contract is given by the government, that contract is gone. They've lost control over it. The contract is disappeared once and forever.
 
 
 29
 That's just not true here. The loss of control here is of a very different order and I would submit that it's of such a different order that it doesn't really constitute the loss of control that is the harm that any case has ever contemplated because the money is not gone. And the Hellmans don't have control over it.
 
 
 30
 THE COURT: I think you've argued that. I think you've argued that and I think that you agree that under Wedtech this is the harm contemplated.
 
 
 31
 MR. COOPER: I understand that the cases say that loss of control is the harm contemplated. I'm not aware of any case that's reached this far out in the limit of a harmless harm. And I think it's still distinguishable from all the cases, including Wedtech....
 
 
 32
 THE COURT: I think we're rearguing a point that's been argued and argued and argued. I don't want to cut you short because it's a worth while point. And I am going to deny your Rule 29 motion on that basis and you may renew it if necessary.
 
 
 33
 Now, if there is specific language--
 
 
 34
 MR. COOPER: It's not the language.
 
 
 35
 THE COURT: Well, you have clearly reserved your position that the theory of inducing a bank to lend you money by making a representation when you know if the bank had known the truth it would not have made the loan is not sufficient to make out fraudulent intent.
 
 
 36
 MR. COOPER: Exactly so.
 
 
 37
 The district court thereafter read to the jury the instructions described above.
 
 
 38
 On December 17, 1992, the jury found Wayne Hellman guilty on both counts, and acquitted Judith Hellman. Hellman was sentenced on August 16, 1994 to three years' probation.[3] This appeal followed.
 
 Discussion
 
 39
 Hellman advances two arguments on this appeal. First, he contends that the district court improperly instructed the jury on the "right to control" theory of mail and wire fraud. He claims that, in violation of this Court's decision in United States v. Mittelstaedt, 31 F.3d 1208 (2d Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 738, 130 L.Ed.2d 640 (1995), the district court's instruction permitted the jury to convict him if it found that he intended to induce Freehold Savings to make a loan that it would not otherwise have made, irrespective of whether he intended to inflict any economic loss upon Freehold Savings.
 
 
 40
 Second, Hellman submits that the evidence presented at his trial was insufficient as a matter of law to convict him for mail or wire fraud. Consistent with his objection to the language of the "right to control" instruction, Hellman argues that submitting false information to a bank in order to obtain a loan does not constitute mail or wire fraud when "that information had no impact on the ultimate value of the transaction to the bank." He contends that since the government offered nothing to demonstrate that Hellman's misrepresentation was material--i.e., that he had sought to inflict an economic injury upon the bank--the evidence was legally insufficient to support his conviction for mail and wire fraud. We address these contentions in turn.
 
 
 41
 A. Instructional Error.
 
 
 42
 We confront at the outset the government's contention that Hellman did not preserve his claim of instructional error, with the result that we may rule in his favor only if we find plain error in the court's instructions. See Fed.R.Crim.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the [district] court."); United States v. Olano, 507 U.S. 725, 734, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993) ("Normally, although perhaps not in every case, the defendant must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong of Rule 52(b).").
 
 
 43
 Hellman argues that his codefendant's comments at the charging conference preserved his claim of instructional error.[4] The government asserts that these comments were inadequate to satisfy the requirements of Rule 30 of the Federal Rules of Criminal Procedure, which provides in pertinent part:
 
 
 44
 No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection.
 
 
 45
 Were it necessary to decide the issue, we would probably resolve it in Hellman's favor. Judge Cedarbaum explicitly stated at the charging conference: "[Y]ou have clearly reserved your position that the theory of inducing a bank to lend you money by making a representation when you know if the bank had known the truth it would not have made the loan is not sufficient to make out fraudulent intent." We read counsel's immediately preceding comment that "the language" of the district court's instruction was not at issue as simply acknowledging that the district court's proposed instruction fairly reflected the court's view of the necessary intent "to defraud" under §§ 1341 and 1343. See supra notes 1 and 2. Counsel had made explicitly clear his disagreement with the court's view of the law, and proposed alternative instructions that the court rejected. It would have been superfluous, in our view, for counsel to have specified the particulars in which the court's instructions diverged from counsel's view of the governing law. See Anderson v. Branen, 17 F.3d 552, 556-57 (2d Cir.1994) ("This Court ... will disregard the failure to object [to jury instructions] ... where the party's position has previously been made clear to the trial court and it was apparent that further efforts to object would be unavailing.").
 
 
 46
 In any event, the issue need not be decided. As will appear, we believe that there was no error in the district court's instructions. Thus, we need not decide whether plain error review is applicable on this appeal. See Olano, 507 U.S. at 732, 113 S.Ct. at 1777 ("The first limitation on appellate authority under Rule 52(b) is that there indeed be an 'error.' "); Crowley v. Courville, 76 F.3d 47, 51 (2d Cir.1996) (when decision under review would be affirmed under any standard of review, no standard need be selected).
 
 
 47
 " 'A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law.' " United States v. Masotto, 73 F.3d 1233, 1238 (2d Cir.1996) (quoting Anderson, 17 F.3d at 556), petition for cert. filed, 64 U.S.L.W. 3765 (U.S. May 1, 1996) (No. 95-1794). If such an error exists, "we will only reverse on this basis if [Hellman] can show that the charge given, when read as a whole, caused [him] prejudice." United States v. Locascio, 6 F.3d 924, 939 (2d Cir.1993), cert. denied, --- U.S. ----, ----, 114 S.Ct. 1645, 1646, 128 L.Ed.2d 365 (1994); see also Masotto, 73 F.3d at 1238 ("An erroneous instruction requires a new trial unless the error is harmless."); Fed.R.Crim.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.").
 
 
 48
 The mail and wire fraud statutes make it a crime to use the mail or wires in furtherance of a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." See §§ 1341 and 1343, supra notes 1 and 2. Thus, " '[t]he essential elements of a mail [or wire] fraud violation are (1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails [or wires] to further the scheme.' " United States v. Miller, 997 F.2d 1010, 1017 (2d Cir.1993) (quoting United States v. Wallach, 935 F.2d 445, 461 (2d Cir.1991) (some alterations added in Miller )).[5]
 
 
 49
 With respect to the second element of these offenses, the government need not prove that the scheme successfully defrauded the intended victim. Mittelstaedt, 31 F.3d at 1216. "However, the government must show 'that some actual harm or injury was contemplated by the schemer.' " D'Amato, 39 F.3d at 1257 (quoting United States v. Regent Office Supply Co., 421 F.2d 1174, 1180 (2d Cir.1970) (emphasis in Regent Office Supply )). Thus, fraudulent intent is "[e]ssential to a scheme to defraud." Id.
 
 
 50
 In this case, the government sought to prove Hellman's fraudulent intent based upon the theory that Hellman deprived Freehold Savings of information relevant to its decision whether it would extend him a loan; i.e., that he lied in order to deprive Freehold Savings of control over its own assets. This right to control " 'theory is predicated on a showing that some person or entity has been deprived of potentially valuable economic information.' " Id. (quoting Wallach, 935 F.2d at 462-63). Hellman contends that the jury instruction explicating the "right to control" theory in this case failed to comport with our decision in Mittelstaedt.
 
 
 51
 In Mittelstaedt, the defendants were a consulting engineer to a village in Long Island, New York and his confederates. 31 F.3d at 1210. The engineer misappropriated information from the village concerning public works projects and then bid on the projects with his confederates, concealing from the village his economic interest in the transactions. Id. at 1211. On appeal, the engineer challenged his convictions for mail fraud with respect to one of these transactions. Reversing those convictions, we stated that "the information withheld either must be of some independent value or must bear on the ultimate value of the transaction." Id. at 1217. We ruled that the jury instructions "effectively permitted the jury to convict [the engineer] for nothing other than a breach of fiduciary duty," id. at 1218,[6] and concluded that "lack of information that might have an impact on the decision regarding where [the defrauded party's] money is spent, without more, is not a tangible harm and therefore does not constitute a deprivation of section 1341 'property,' " id. at 1217.
 
 
 52
 Hellman argues that the "right to control" instruction in this case contravenes our holding in Mittelstaedt because it permitted the jury to convict him in the absence of any evidence that he intended to inflict an economic injury upon Freehold Savings. As previously noted, the key portion of the challenged jury instruction states:
 
 
 53
 "Intent to defraud" means to act knowingly and with the specific intent to deceive for the purpose of causing some financial or property loss to another. The government is not required to prove that anyone was actually defrauded to establish a violation by the defendant you are considering. No actual pecuniary injury need result to the victim of the fraud.
 
 
 54
 Under the mail fraud statute, the definition of property includes intangible property interests such as the right to control the use of one's own assets. This interest is injured when a person is deprived of information he would consider valuable in deciding how to use his assets.
 
 
 55
 Emphasis added.
 
 
 56
 The first paragraph of the quoted instruction is clearly consistent with both Mittelstaedt and the other Second Circuit precedents that we have summarized in this opinion. The second paragraph, on the other hand, might be deemed facially at odds with the Mittelstaedt formulation that "lack of information that might have an impact on the decision regarding where [the defrauded party's] money is spent, without more, is not a tangible harm and therefore does not constitute a deprivation of section 1341 'property.' " 31 F.3d at 1217. There is, however, a clear factual distinction between Mittelstaedt and this case.
 
 
 57
 The jury instructions in Mittelstaedt left open the possibility of a conviction premised solely upon the disinclination of the municipal authorities "on general principles" to deal with an insider who had abused his fiduciary position. See 31 F.3d at 1218. In this case, by contrast, Conklin testified twice that Freehold Savings would not make a loan to any applicant whose income did not constitute twenty-eight percent of the debt service on the mortgage. Especially in view of the instruction that Hellman had to intend to cause the bank "some financial or property loss," we find no basis upon which to conclude that Judge Cedarbaum's instruction regarding "information [the bank] would consider valuable in deciding how to use [its] assets" could have led the jury to find Hellman guilty for deceiving the bank in an immaterial way. "To be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction." Mittelstaedt, 31 F.3d at 1217 (citing Carpenter, 484 U.S. at 27, 108 S.Ct. at 321). The information withheld in this case significantly diminished "the ultimate value of the [mortgage] transaction" to the bank as defined by its standard lending practices, whether or not a subsequent default ensued.[7] Therefore, we believe that the instruction, "when read as a whole," did not prejudice Hellman. Locascio, 6 F.3d at 939.
 
 
 58
 We note that there is some tension between Mittelstaedt and Judge Learned Hand's statement in United States v. Rowe, 56 F.2d 747 (2d Cir.), cert. denied, 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289 (1932), that the mail fraud statute is designed to protect a defrauded party's right "to bargain with the facts before him," whether or not there is proof of damage or of an unequal bargain. Id. at 749. In Regent Office Supply, however, we specified that Rowe would not "support the conclusion that no definable harm need be contemplated by the accused to find him guilty of mail fraud." 421 F.2d at 1181; see also In re the Seizure of All Funds in Accounts in the Names Registry Publishing, Inc., 68 F.3d 577, 581-82 (2d Cir.1995) (construing Regent Office Supply as requiring that undisclosed facts be "material to the bargain" that the defrauded party is induced to enter). The pertinent Rowe language was quoted with approval in Wallach, 935 F.2d at 463, but Wallach is clearly a case in which the withheld information was material; corporate insiders withheld information of improper dealings from the corporation's shareholders, and the effect of those dealings was to generate widespread federal investigations of the corporation and drive it into bankruptcy. See 935 F.2d at 453; see also Litwin v. American Express Co., 838 F.Supp. 855, 859 (S.D.N.Y.1993) (interpreting Wallach to require that "an unlawful scheme to defraud must include at a minimum the potential for actual harm or injury").
 
 
 59
 B. The Sufficiency of the Evidence.
 
 
 60
 Hellman also relies primarily upon Mittelstaedt to contest the sufficiency of the evidence supporting his mail and wire fraud convictions. As with his claim of instructional error, Hellman argues that the government presented no evidence that he intended to cause any economic harm to Freehold Savings by misrepresenting his income. For the reasons discussed above, we reject this contention. The district court correctly instructed the jury on the "right to control" theory of mail and wire fraud, and the government presented sufficient evidence for a rational trier of fact to convict Hellman based upon that theory. See D'Amato, 39 F.3d at 1256 (If the evidence "viewed in the light most favorable to the government ... suffice[s] to convince any rational trier of fact that the crime charged has been proven beyond a reasonable doubt, then the conviction must stand.").
 
 Conclusion
 
 61
 The judgment of the district court is affirmed.
 
 OAKES, Senior Circuit Judge, concurring:
 
 62
 I concur in the judgment of the court. I agree that, in accordance with United States v. Mittelstaedt, 31 F.3d 1208 (2d Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 738, 130 L.Ed.2d 640 (1995), the income information withheld by Hellman can be viewed as material information depriving Freehold Savings of the right to control its decision regarding the grant of Hellman's loan application.
 
 
 63
 I write separately only to point out that this case has an inherent inequity. Hellman was originally charged in a seventy-eight count, twenty-four defendant indictment of an organized crime group. For various reasons recited by the majority, nearly all of the counts against Hellman were eventually resolved in his favor. On a remand by this court of a few of those counts, the Government prosecuted Hellman solely for the fraudulent residential loan application. The Government chose to do so despite the fact that Freehold Savings's monetary interests were well secured at all times, see supra at 279, and the loan was repaid in full. That Freehold Savings was an innocent party is somewhat in doubt: after Hellman's income initially proved too small to support the loan, Freehold Savings asked whether he had any sources of income not previously disclosed. Hellman then told Freehold Savings of a $28,600 a year job as a flea market manager that he claimed to have held for three years. Freehold Savings accepted this sizable "oversight" without further investigation, despite the fact that Hellman's income had previously proven to be too small. It seems to me that the parties to the loan probably knew exactly what was going on--despite Hellman's lack of provable income, Freehold Savings felt the loan was a good risk. Given these facts, I believe that the Government is very close to overreaching by prosecuting Hellman for this so-called scheme to defraud.
 
 
 
 [1]
 As applicable to the conduct charged in this case, § 1341 stated in pertinent part:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
 
 
 [2]
 As applicable to the conduct charged in this case, § 1343 stated:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
 
 
 [3]
 Because the conduct with which Hellman is charged took place prior to November 1, 1987, he is not subject to the provisions of the Sentencing Guidelines with respect to that conduct. See United States v. Metallo, 908 F.2d 795, 800 (11th Cir.1990), cert. denied, 503 U.S. 940, 112 S.Ct. 1483, 117 L.Ed.2d 625 (1992)
 
 
 [4]
 The government asserts that Hellman cannot avail himself of an objection made by his codefendant's counsel because Hellman's counsel did not join in the objection. This argument is without merit. See United States v. Lefkowitz, 284 F.2d 310, 313 n. 1 (2d Cir.1960) ("We do not regard the failure of [defendant's] counsel to except [to the jury instruction] as barring [that defendant] from seeking reversal for error in the charge; [codefendant's counsel's] exception called the matter to the judge's attention and further exception would have been fruitless.")
 
 
 [5]
 Because both § 1341 and § 1343 are phrased in the disjunctive ("[w]hoever, having devised ... any scheme or artifice to defraud, or for obtaining money or property [emphasis added]"), it may appear odd that our cases require both a scheme or artifice to defraud and money or property as the object of the scheme. Cf. United States v. Kennedy, 64 F.3d 1465, 1475 (10th Cir.1995) ("To prove a violation of the mail fraud statute, the government must prove ... the devising of a scheme or artifice either (a) to defraud or (b) for obtaining money by means of false or fraudulent pretenses, representations, or promises...."). Our formulation results from the Supreme Court's determination in McNally v. United States, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), and Carpenter v. United States, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), that § 1341 "is 'limited in scope to the protection of property rights.' " Carpenter, 484 U.S. at 25, 108 S.Ct. at 320 (quoting McNally, 483 U.S. at 360, 107 S.Ct. at 2881-82); see also Miller, 997 F.2d at 1016-17. The McNally/Carpenter rule has been limited by statute. See 18 U.S.C. § 1346 ("For the purposes of this chapter [which includes §§ 1341 and 1343], the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."). This case, however, does not present an "honest services" issue, and in any event, § 1346, whose effective date is November 18, 1988, see Mittelstaedt, 31 F.3d at 1216, is inapplicable to the 1980-1981 transaction at issue on this appeal
 
 
 [6]
 The events at issue predated the effective date of 18 U.S.C. § 1346. See supra note 5
 
 
 [7]
 These practices are not arbitrary. A mortgage loan that is more exposed to default because of an inadequate income stream to fund the required periodic payments is reduced in value as an asset, and mortgages are often conveyed as assets in the secondary mortgage market. Further, an increased likelihood of default, and the resulting necessity for foreclosure, is in any event a less appealing prospect to a lender than an uninterrupted flow of periodic payments