**UNITED STATES of America,**

v.

**James M. SVENDSEN, Defendant.**

**No. 98 CV 791(ILG).**

United States District Court, E.D. New York.

Nov. 5, 1999.

Edward F. Westfield, New York City, NY, for James Svendsen.

Seth L. Marvin, Assistant U.S. Attorney, United States Attorney, Eastern District of New York, Brooklyn, New York, for U.S.

### MEMORANDUM and ORDER

GLASSER, District Judge.

Petitioner James M. Svendsen brings this action pursuant to 28 U.S.C. § 2255 seeking an order vacating, setting aside or correcting his sentence. Svendsen argues that (1) he received ineffective assistance of counsel; (2) he was convicted on the basis of insufficient evidence showing that he acted with the requisite intent; (3) the jury charge in his case was so flawed as to deprive him of a fair trial; and (4) the Government's suppression of evidence favorable to him so undermines confidence in the outcome of his trial as to require vacatur of his sentence and conviction, or alternatively, an evidentiary hearing to ascertain the facts concerning the Government's alleged conduct. For the reasons that follow, Svendsen's petition is denied.

### PROCEDURAL HISTORY

After a trial by jury, petitioner Svendsen was convicted of a single count of mail fraud, in violation of 18 U.S.C. § 1341.[1] On January 29, 1997, Svendsen was sentenced to five years probation (with four months of home detention), and restitution of $17,891.82. Svendsen took no direct appeal, and on January 27, 1998, he filed the instant § 2255 petition.

### BACKGROUND

#### A. The Government's Case

Svendsen retired from the New York Fire Department ("NYFD") on June 1, 1989, due to a service-related disability. As a disabled firefighter with less than 20 years of service, Svendsen was eligible for a lifetime pension of 75% of his final salary. (Tr. 37).[2] Under the rules of the NYFD Pension Fund governing disability pensions, Svendsen was allowed to earn a certain sum in excess of his pension, before being required to refund such outside income to the Fund. (Tr. 33–34). In 1989 Svendsen was informed by the Pension Fund that he was allowed to earn $19,354 in outside income—a figure which when added to the amount of Svendsen's pension generates what the Pension Bureau refers to as his "Safeguard Limitation." (Tr. 39–40, 44–45). Between 1989, Svendsen's Safeguard Limitation, as calculated by the Pension Bureau, increased from $51,249.88 in 1990, to $64,503.49 in 1994. (Tr. 64–65, 79). This meant that in 1994, Svendsen could have earned $32,607.51 before incurring the obligation to refund excess income to the Pension Fund. (Tr. 64–65).

In 1994, Svendsen earned income in excess of his pension. Specifically, Svendsen received wages and salary for work performed while in the employ of two construction companies (one of which, All Boro Construction, Inc., he had formed and was serving as company president). As reflected on Svendsen's federal tax return for 1994, his adjusted gross income from these sources came to $44,994. (Tr. 88–99, 106–110).

In 1995, the FDNY Pension Fund sent four "Safeguard questionnaires" to Svendsen, soliciting information about income earned in excess of his pension for the years 1991, 1992, 1993, and 1994. (Tr. 47–48, 55, 58, 61, 71, 76). The questionnaires were accompanied by instructions defining the scope of earnings subject to the Safeguard Limitation. Those instructions state that "reportable" earnings include

salaries, wages, commissions, fees, etc., received from personal services ren-

---

1. This was Svendsen's second trial on the charge, the first having ended in a mistrial after the jury found itself unable to reach a verdict. Hereafter all references to Svendsen's "trial" are to the proceeding that resulted in his conviction.

2. The reference is to the transcript of Svendsen's second trial.

dered and shall include income from self-employment when one's physical effort is a factor in the production of such income.

(Tr. 55–56, Gvt.Exh.2). The questionnaires also specifically inquired whether the information being reported concerning earnings was compatible with pensioner's federal income tax returns, and requested an explanation of any discrepancies. (Tr. 60, Gvt.Exh.2).

On January 29, 1996, Svendsen completed and signed the four questionnaires, and mailed them to the FDNY Pension Fund in Brooklyn. (Tr. 30, 64). On the questionnaire for 1994, Svendsen indicated that he had no earnings, and responded "N/A" under the column marked "Name of Employer." In response to the question concerning discrepancies with his 1994 federal tax return, Svendsen wrote nothing. Svendsen entered the same information on the other three questionnaires. (Gvt.Exh.2).

Based on the wages and salary declared on his 1994 tax return, and not declared on the Safeguard questionnaire for 1994, Svendsen would have been required to refund $17,891.49 to the Pension Fund. (Tr. 59–65, 70, 84).

### B. *The Defense Case*

In testifying in his own defense, Svendsen acknowledged that his 1994 federal tax return accurately reflected his income earned in excess of his FDNY pension. (Tr. 131–32, 138–41). He also admitted that he had failed to report this income on the Safeguard questionnaire for 1994. In explanation of this failure, Svendsen stated that (i) he had been "a little confused" by the accompanying instructions; (ii) he had filled the forms out in an anxious rush, because they were due the following day and he was worried that his pension payments might be suspended; and (iii) he had believed that he was exempted from the Safeguard reporting requirements because he was self-employed, and also be-

cause he did not derive income from his physical labor. (Tr. 131).

In reference to the Safeguard Limitation, Svendsen stated that, although he had been informed in 1989 that he was permitted to earn no more in that year than $19,354 in income beyond his pension, he had received no additional information on the matter since that time. (Tr. 39, 127, 132). As a result, he said, "I never knew what the [Safeguard] threshold was. I had no way of ever knowing how they do it." (Tr. 132).

### C. *The Court's Charge to the Jury*

The Court instructed the jury that the Government had to prove beyond a reasonable doubt that Svendsen intended to defraud the Pension Fund in order to be guilty of mail fraud. In expatiating on this concept, the Court said:

> And when we speak of an intent to defraud, we mean to act knowingly with a specific intent to deceive for the purpose of causing some financial loss or some action or no action to be taken by somebody else.

(Tr. 196). The Court then turned to an explanation of the good faith defense to fraud:

> Now, since an essential element of the crime with which the defendant is charged is that he intended to defraud, it follows that good faith on the part of the defendant is a complete defense to a charge of mail fraud. A defendant doesn't have the burden of establishing the defense of good faith. The burden is on the government to prove that the defendant acted fraudulently and that he lacked the good faith and the government has the burden of proving that and it has the burden of proving everything beyond a reasonable doubt.
>
> Under the mail fraud statute even a false representation or statement or even an omission of a material fact doesn't amount to fraud unless it was done with a fraudulent intent. However misleading, however deceptive a plan

may have been, it is not fraudulent if it was devised or carried out in good faith. An honest belief in the truth of a representation is a good defense however inaccurate the statement may turn out to be.

(Tr. 197–98).

## DISCUSSION

### A. Svendsen's Claim of Ineffective Assistance of Counsel

Svendsen argues that he was denied his Sixth Amendment right to effective assistance of trial counsel. Specifically, Svendsen argues that his counsel at trial failed (i) to adduce evidence, which was readily available through the exercise of due diligence, showing that the Pension Fund had promulgated the Safeguard Limitation unlawfully[3]; (ii) to investigate or to prove at trial the fact that the six highest-paid lieutenants in the FDNY in 1994 earned more than the amount earned by Svendsen that year in pension payments and other wages and salary; and, (iii) to file a timely notice of appeal.

The cumulative effect of the first two lapses, Svendsen argues, was to deprive him of a defense at trial, which had it been interposed on his behalf, would have changed the outcome. In particular, Svendsen claims that his trial counsel should have argued that because there had been no valid promulgation of the rule under which the Safeguard Limitation was determined, he was actually correct in believing that the Pension Fund was not entitled to any reimbursement from him, and thus, under no legal obligation to report his outside income fully.[4] Svendsen also claims that his counsel at trial negligently failed to buttress this defense by showing that he lacked the requisite intent, based on his belief that the amount he was allowed to earn under a validly promulgated Safeguard Limitation (had there been one) would be in the vicinity of the six highest lieutenant's salaries for 1994 (that is, more than Svendsen actually earned).

### 1. The Legal Standard for Ineffective Assistance of Counsel

A § 2255 petitioner asserting a claim of ineffective assistance of counsel faces a "difficult two-part test." *DeLuca v. Lord*, 77 F.3d 578, 584 (2d Cir.), *cert. denied*, 519 U.S. 824, 117 S.Ct. 83, 136 L.Ed.2d 40 (1996). First, it must be demonstrated that counsel's performance was "deficient" as measured against "an objective standard of reasonableness ... under prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Second, "the [petitioner] must show that the deficient performance prejudiced the defense," in the sense that they were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. 2052.

---

3. Svendsen argues that the Pension Fund failed to obtain approval from the then-existing Board of Estimate for rules pursuant to which the Safeguard Limitation would be calculated year to year, as was required under the provisions of 2A City Admin.Code § B19–7.11 (1976). (Pet.'s Mem. of Law at 5–6.) Svendsen also argues that the Pension Fund failed to comply with provisions of the former New York City Charter, Chapter 49, Section 1105, under which the Pension Fund was allegedly required to provide public notice of its promulgation of rules for the determination of the Safeguard Limitation. (Pet.'s Mem. of Law at 6–8.)

4. Svendsen also claims that his trial counsel unreasonably relinquished the opportunity to offer a defense based on Svendsen's lack of intent requisite for mail fraud, based on his belief that the Safeguard Limitation was invalid and without legally binding effect. For reasons that follow, this latter contention may properly be treated as a logical part of the argument from the lack of valid promulgation, inasmuch as it simply re-states the crucial element of a defense based on mistake of law, or ignorance due to unavailable law— namely, lack of the requisite intent based on mistake or ignorance made reasonable by the state's failure properly to enact the law, or give notice of its existence.

A court's assessment of the reasonableness of counsel's performance "must be highly deferential[,]" inasmuch as "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689, 104 S.Ct. 2052. But even if the attorney's performance is found unreasonably deficient under this standard, no violation of the Sixth Amendment occurs unless petitioner can also show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052; *DeLuca v. Lord,* 77 F.3d at 584. The *Strickland* Court defined "reasonable probability" as a "probability sufficient to undermine confidence in the outcome," while keeping in mind "the totality of the evidence before the judge or jury." *Strickland v. Washington,* 466 U.S. at 695, 104 S.Ct. 2052.

### 2. *Mistake or Unavailability of Law*

Svendsen's argument that he received ineffective assistance of counsel at trial is premised, first, on his trial counsel's alleged failure to investigate and propound what in essence amounts to a mistake of law defense. More precisely, Svendsen asserts that trial counsel was ineffective because he failed to explore and offer a theory of justification based on the purported fact that the rules governing the calculation of Svendsen's Safeguard Limitation were not made available to him in a

way that would have given him reasonable notice. *See* 2 Paul H. Robinson, *Criminal Law Defenses* § 182 at 381 (1984) ("An actor is excused for his conduct constituting an offense if (i) because a law is not made available, before the conduct constituting the offense, in a way that would give notice to the reasonable person, and (ii) the actor makes a reasonable mistake regarding the law and as a result, the actor does not know his conduct is criminal.").

Read in the light most favorable to Svendsen, the theory he appears to advance is that (i) the Pension Fund failed to comply with laws dictating that public notice be given of the rules governing determination of the Safeguard Limitation; (ii) as a result, those rules were never validly promulgated; (iii) in the absence of validly promulgated rules, Svendsen reasonably relied on information and belief indicating that his Safeguard Limitation was at least equal to the current salaries of certain FDNY lieutenants which were higher than the sum of his pension and other earnings [5] ;and, (iv) thus, when he misrepresented the true extent of his outside earnings on the Safeguard questionnaires, he lacked the requisite intent, in the sense that he did not know that his conduct was criminal. The question here is whether, in failing to present this defense, Svendsen's trial counsel was ineffective.

 That question is readily disposed of, even under the assumption that the Pension Fund rules regarding the Safeguard Limitation were not validly promulgated.[6] The prospects at trial for

---

**5.** Although Svendsen did testify in his own defense at trial, he made no mention of having formed such a belief, or of having consulted with anyone for the specific purpose of ascertaining his Safeguard Limitation. To the contrary, he testified that he did not know his Safeguard Limitation, and asserts his belief concerning lieutenant's pay in 1994 for the first time in this proceeding. (Tr. at 132; Pet.'s Mot. under 28 U.S.C. § 2255, Att. A.) Because, standing alone, Svendsen's claim sustains nothing more than a claim-of-right defense (which is no defense to a charge of

mail fraud), it is considered here only in the potentially more favorable context of Svendsen's forgone mistake of law defense. *See United States v. Gole,* 158 F.3d 166, 168 (2d Cir.1998) ("[C]ourts have uniformly held that a claim-of-right is not a defense to mail fraud.") (citing cases).

**6.** That is by no means self-evident. Svendsen relies on language of the relevant provision of the New York City Administrative Code, standing alone and without citation to other authority, for the dubious proposition that, at

a defense predicated on mistake, or justification due to unavailable law, would have presented a question governed by New York law. *See United States v. Brennan,* 938 F.Supp. 1111, 1119 (E.D.N.Y.1996) (holding that state law supplies the standard for determining whether defendant owed fiduciary duties to the purported victims of an alleged mail fraud scheme). The provisions for such a defense in New York are narrow, and strictly construed. *See* N.Y.Penal Law § 15.20(2) ("A person is not relieved of criminal liability for conduct because he engages in such conduct under a mistaken belief that it does not, as a matter of law, constitute an offense, unless such mistaken belief is founded upon an official statement of the law contained in (a) a statute or other enactment, or (b) an administrative order or grant of permission, or (c) a judicial decision of a state or federal court, or (d) an interpretation of the statute or law relating to the offense, officially made or issued by a public servant, agency or body legally charged or empowered with the responsibility or privilege of administering, enforcing or interpreting such statute or law."); *People v. Marrero,* 69 N.Y.2d 382, 389, 515 N.Y.S.2d 212, 507 N.E.2d 1068 (1987) ("While providing a narrow escape hatch, the idea [behind the adoption of Penal Law § 15.20(2) ] was simultaneously to encourage the public to read and rely on official statements of the law, not to have individuals conveniently and personally question the validity and interpretation of the law and act on that basis."). Indeed, the discussion of New York Court of Appeals in the leading case of *Marrero* reveals just how far Svendsen fell short of presenting a viable mistake of law defense on the facts in his case:

least in 1980, each time the FDNY Pension Fund acted in an official capacity, it was required to do so by way of a "rule or regulation" requiring approval by the Board of Estimate. In fact, the rules regarding the Safeguard Limitation were adopted by resolution, not "rule or regulation"—a distinction well-established in the customs and practices of

[M]istake of law is a viable exemption in those instances where an individual demonstrates an effort to learn what the law is, relies on the validity of that law and later, it is determined that there was a mistake in the law itself.

*Id.* at 390, 515 N.Y.S.2d 212, 507 N.E.2d 1068. On the uncontested facts, Svendsen made no effort to learn what the law was, or to the extent he did, he relied on sources that are not privileged under Penal Law § 15.20(2), and now seeks to justify that conduct by arguing that, all along, there was a "mistake in the law itself," taking the form of a deficiency in the process of promulgation severe enough to have rendered that law a nullity. There is no construction of mistake of law principles in the penal law of New York that makes out a defense on these facts, and Svendsen's trial counsel was not ineffective in declining to investigate or present such a defense.

To the extent that Svendsen claims that his trial counsel was ineffective simply because he failed to present the defense that the Safeguard Limitation had been established unlawfully, without reference to any defense based on mistake or unavailability of law, his argument fails on grounds well established in the case law. *See Dennis v. U.S.,* 384 U.S. 855, 866, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966) (reviewing fraud convictions, and rejecting attempt to assert unconstitutionality of fraud statute as a defense thereto); *United States v. Weiss,* 914 F.2d 1514, 1522–23 (2d Cir.1990) (rejecting claim that fraud prosecution was barred because Medicare guidelines under which defendant had been convicted "had not been approved by the Director of the Office of Management and Budget, as the Paperwork Reduction

the Pension Fund (not just of the FDNY, but also of other pension fund systems governed by the NYC Administrative Code), and premised on the desire to avoid the cumbersome process of securing approval of actions taken in the routine exercise of administrative authority. *See* Gov.Mem. of Law in Opp., Exh. F (Dwyer Aff.) at ¶¶ 14–16.

Act allegedly required"). The underlying reason why such a defense is unavailing is that mail fraud is directed at bottom to the intent to defraud, and not the intent to violate a particular statute. *United States v. Porcelli,* 865 F.2d 1352, 1358 (2d Cir. 1989). Thus, even if Svendsen did not intend to violate the rules governing the Safeguard Limitation because he did not know about them or believed that they are a nullity, if he nevertheless did intend to defraud the Pension Fund by lying to it (using the mail) about the true extent of his outside income, he is guilty of mail fraud. For this reason too, Svendsen's trial counsel was not ineffective in declining to offer a defense based on the invalidity of the rules governing calculation of the Safeguard Limitation.

The strategy of Svendsen's counsel at his second trial was a two-pronged attempt to undercut the Government's evidence of Svendsen's fraudulent intent in under-reporting his income. Trial counsel elicited testimony from Svendsen that he had honestly believed that all his income was exempt from disclosure, inasmuch as it derived entirely from self-employment, and did not involve physical effort. Trial counsel also argued, relying largely on his cross-examination of an accountant for the Pension Fund, that the Safeguard questionnaires were so complicated that Svendsen was reasonable in misapprehending their import, and in filling them out incorrectly. The jury at Svendsen's second trial thus heard a full airing of the factual issues bearing on whether Svendsen acted with the requisite intent to deceive in filling out the questionnaires. That it decided against Svendsen cannot be attributed to his trial counsel's ineffectiveness.

### 3. *Svendsen's Right to Appeal*

Svendsen also argues that he was deprived of his right to appeal by ineffective assistance of counsel. The Government responds in part by pointing to an affidavit from Svendsen's trial counsel stating that after being asked about the prospects for an appeal by his client, he discussed the matter with a legal research service, concluded that any appeal would have little merit, and advised Svendsen accordingly. Svendsen's trial counsel says that Svendsen did not ask him to file an appeal. (Gov.Mem. of Law, Exh. G, Bandes Aff.) For his part, Svendsen replies with an affidavit stating that he did instruct his trial counsel to file an appeal of his conviction, notwithstanding his counsel's discouraging assessment of the prospects of such an appeal. (Pet.'s Reply Mem. of Law, Exh. C, Svendsen Aff.)

As the Second Circuit has recently observed, "many circumstances bear on whether counsel's failure to file an appeal constituted deficient representation, 'including whether defendant's counsel so advised him prior to sentencing ..., or whether the court gave him notice of his appellate rights ..., ... not to mention the variable merits and prospects of an appeal....'" *McHale v. United States,* 175 F.3d 115, 118 (2d Cir.1999) (quoting *Morales v. United States,* 143 F.3d 94, 96 (2d Cir.1998)). *McHale* involved a § 2255 petitioner asserting ineffective assistance of counsel on the ground that his appellate counsel, after filing a timely notice of appeal, had then abandoned the appeal resulting in its dismissal. In *Morales,* a § 2255 petitioner premised his claim of ineffective assistance on his retained lawyer's failure to advise him of his right to appeal, and then to file an appeal in the absence of petitioner's explicit indication that he did not wish to pursue one. In another recent case, *Hooper v. United States,* 112 F.3d 83 (2d Cir.1997), a § 2255 petitioner sought relief on a theory of ineffectiveness due to counsel's failure to file a timely notice of appeal, a claim the Court rejected in reaching the merits of the underlying ground of appeal, and finding no prejudice under the second prong of the *Strickland* test.

This case presents a variation on the scenarios considered in *McHale, Morales,* and *Hooper.* Unlike petitioner in *McHale,*

Svendsen never filed a notice of appeal. *McHale*, 175 F.3d at 119. Unlike petitioner in *Morales*, Svendsen presents an affidavit stating that he requested that his lawyer file a notice of appeal. *Morales*, 143 F.3d at 97. And unlike petitioners in all three cases, Svendsen has never had to represent himself in post-trial proceedings.

■ Svendsen insists that, having shown that his lawyer was told to file an appeal but failed to do so, he need make no further showing of prejudice. Svendsen relies on a venerable line of Supreme Court authority holding that "when a defendant's failure to appeal a conviction is attributable to an error by his lawyer, the defendant is entitled to collateral relief without requiring him to show that his appeal would have had merit." *Peguero v. United States*, 526 U.S. 23, ——, 119 S.Ct. 961, 966, 143 L.Ed.2d 18 (1999) (O'Connor, J. concurring) (citing *Rodriquez v. United States*, 395 U.S. 327, 89 S.Ct. 1715, 23 L.Ed.2d 340 (1969)). But, as the Second Circuit noted in *McHale*, "*Rodriquez* . . . [was] animated by a concern that requiring a *pro se* litigant on a section 2255 motion to demonstrate the merit of a hypothetical appeal would undermine the right to counsel enjoyed by every criminal defendant on direct appeal." *McHale*, 175 F.3d at 118; *see also Morales*, 143 F.3d at 97 (stating that "[w]e are reluctant to extend a rule of *per se* prejudice in any new direction," and declining to announce such a rule with respect to his attorney's failure to file a notice of appeal on his behalf, after having told him that the prospects of such an appeal were poor).

That concern is simply not implicated here, where Svendsen has had the benefit of quite competent counsel on his § 2255 motion, who has vigorously pressed all of the claims Svendsen might have raised on an appeal. Those claims in turn have been fully briefed by both Svendsen's counsel and the Government. Finally, all of those claims are herein resolved on their merits, without invocation of the procedural default mechanisms that might otherwise prejudice a § 2255 petitioner who had previously forgone a direct appeal.

■ Thus, even assuming the truth of Svendsen's statement that he told his trial counsel to file a notice of appeal, his claim of ineffective assistance for counsel's failure to do so may, under the circumstances presented here, properly be evaluated for prejudice. It is evident that Svendsen can show none. By this petition he has raised, with benefit of counsel, all of the issues he could have raised on direct appeal. By review of the denial of this petition, he will be afforded the same opportunity he would have had by such an appeal, namely a plenary hearing on the merits before a panel of the Second Circuit. On these facts, and notwithstanding the general rule that § 2255 is "not intended to provide a remedy for all claimed errors in conviction and sentencing," *Morales*, 143 F.3d at 96 (citation omitted), it cannot be said that Svendsen was prejudiced by not having had a direct appeal. This means that he cannot satisfy *Strickland*'s cause and prejudice standard on his second theory of ineffectiveness, and accordingly, Svendsen's petition for relief based on his Sixth Amendment claim of ineffective assistance of trial counsel is denied.

### B. *Svendsen's Claim That He Was Convicted On Insufficient Evidence*

Svendsen argues that the only evidence before the jury showing his fraudulent intent was evidence that he had failed to give the Pension Fund information the lack of which he had no reason to know would necessarily result in a loss of money or property to the Pension Fund. Leaving aside Svendsen's claim (already rejected for the reasons set forth in the preceding section) that the jury was impermissibly allowed to consider evidence that he had violated rules regarding the Safeguard Limitation that were without legal effect, his argument is that the evidence showing his fraudulent intent was legally insufficient, because it did not show that Svendsen ever understood, much less intended,

that his false statements on the Safeguard questionnaires would harm the Pension Fund in any way.

To succeed on this claim, Svendsen must show that no rational trier of fact could have found beyond a reasonable doubt that he acted with fraudulent intent in filling out the Safeguard questionnaires, viewing the evidence in the light most favorable to the Government. *Knapp v. Leonardo,* 46 F.3d 170, 178 (2d Cir.), *cert. denied,* 515 U.S. 1136, 115 S.Ct. 2566, 132 L.Ed.2d 818 (1995). Svendsen's strongest argument that he can satisfy this standard derives from a footnote in a recent decision by the Second Circuit involving another FDNY pensioner convicted of mail fraud. In *United States v. Rossomando,* 144 F.3d 197, 201–02 n. 5 (2d Cir.1998), the Court distinguishes two theories of mail fraud. Under the "right to control" theory of mail fraud, "the concrete harm contemplated by the defendant is to deny the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions." *Id.* (citing *United States v. Dinome,* 86 F.3d 277 (2d Cir. 1996) and *United States v. Rodolitz,* 786 F.2d 77 (2d Cir.1986)). In these cases—involving lying on a mortgage application (*Dinome* ), and preventing an insurer from deciding the true value of a claim (*Rodolitz* )—the " 'information withheld either must be of some independent value or must bear on the ultimate value of the transaction.' " *Rossomando,* 144 F.3d at 202 n. 5 (citing *Dinome,* 86 F.3d at 284).

Under a second type of mail fraud prosecution, which the Court distinguished with particular reference to the cases brought against the FDNY pensioners, "it cannot meaningfully be said that the information withheld ... had 'independent value' to the Pension Fund." *Id.* The difference becomes apparent, in fact, only where a pensioner *correctly believes* that the Pension Fund is not entitled to any reimbursement, because in that event, even if the pensioner lies to the Pension Fund about his income, he has not thereby deprived it

of the "right to control" its resources, "because no discretionary 'control' was truly being exercised." *Id.* It follows that a pensioner's knowing misrepresentations of outside income would not by themselves make out a scheme to defraud for the purposes of mail fraud, if the pensioner also "believed that the Fund would not lose any money as a result." *Id..* ·

■ Svendsen invokes the passages just cited in support of his contention that the Government failed to make a legally sufficient showing of his fraudulent intent. But Svendsen's reliance on the *Rossomando* dicta is misplaced. The Government's case was not simply that Svendsen made statements on questionnaires that he knew to be false. The Government also offered evidence showing that he did so in order to avoid having to reimburse the Pension Fund. Thus, when specifically asked on the questionnaires to explain discrepancies between his statements therein and statements made on his federal income tax returns, he made no response, despite being well aware of the stark inconsistencies between the two. Moreover, the Government adduced testimony from an associate of Svendsen named Smith, that in discussing one of their joint construction ventures, Svendsen had told Smith that he (Svendsen) "hoped he doesn't make too much money because it might hurt him ... because he was ... not allowed to make × amount of dollars...." (Tr. at 90.)

In response, Svendsen testified in general terms that he believed his outside income was entirely exempt from the Safeguard Limitation requirements, because they derived from self-employment, and did not involve physical labor. This testimony could be construed as representing that Svendsen believed that he owed the Pension Fund nothing. But Svendsen also testified that he did not know his Safeguard Limitation. (Tr. at 132.) Thus, the jury was presented finally with a credibility determination—whether to credit the Government's evidence, or Svendsen's testimony. That evidence, in turn, certainly

sufficed to support a rational jury in finding beyond a reasonable doubt that Svendsen knew that he was lying when he filled out the questionnaires, and lied with the intention of avoiding any duty to reimburse that might be assessed against him by the Pension Fund. Accordingly, Svendsen's claim that he was convicted on insufficient evidence is without merit.

C. *Svendsen's Due Process Claim Concerning the Jury Charge*[7]

Relying again on *Rossomando,* Svendsen argues that the Court's jury charge improperly suggested that the Government did not have to prove that Svendsen intended to harm the Pension Fund in order to be guilty of mail fraud. In effect, Svendsen claims, the Court's charge suggested to the jury that even if it credited Svendsen's good faith defense, it could nevertheless convict him solely upon a finding that he had intentionally lied on the Safeguard questionnaire—a theory of liability for mail fraud that the Second Circuit proscribed in *Rossomando.*

The charge found improper in *Rossomando* was a variation on the "no ultimate harm" proviso to a good faith defense instruction adapted from 2 Leonard B. Sand, et al., *Modern Federal Jury Instructions* § 44.01. *Rossomando,* 144 F.3d at 201. The point of the instruction as set forth in the Sand treatise is to qualify the principle that there is a good faith defense to mail fraud. The good faith defense to mail fraud is made out where the defendant shows that he honestly believed that he was not doing or saying anything misleading or deceptive, even if what the defendant did or said was actually misleading or

deceptive. The "no ultimate harm" proviso restricts application of the good faith defense, drawing the line at situations in which the defendant believes that "ultimately" things will work so that the victim suffers no loss, despite incurring some immediate, or short-term loss. *Id.* The idea underlying both instructions is that mail fraud requires a finding beyond a reasonable doubt that the defendant contemplated harm to the victim, by means of an intentionally misleading or deceptive representation.

The Court in *Rossomando* disapproved the "no ultimate harm" instruction drawn from Sand, because Rossomando had proffered a defense at trial that he honestly believed that his outside income was well within the Safeguard Limitation, and also believed, accordingly, that under-reporting his income on the Safeguard questionnaires would not harm the Pension Fund. As has been discussed already, the *Rossomando* Court also distinguished the FDNY Pension Fund cases from such "right to control" cases as *Dinome* and *Rodolitz,* where the intentional withholding of information could be deemed by itself to satisfy the intentional harm element of mail fraud. In the FDNY cases, by contrast, a pensioner could intentionally withhold information from the Pension Fund, but if he did so in the honest belief that the Fund would not be harmed as a result, the pensioner would have a complete defense. Taking these considerations together, the *Rossomando* Court concluded that the Sand "no ultimate harm" instruction created "a substantial risk that the jury could have been confused into believing that the government

---

7. Svendsen's claim that the jury charge violated due process, and that the Government withheld *Brady* materials are barred on a § 2255 motion, unless Svendsen can establish both cause for his procedural default, and prejudice. *See Reed v. Farley,* 512 U.S. 339, 354, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994) (" '[T]he general rule is that the writ of habeas corpus will not be allowed to do service for an appeal.' ... Where the petitioner—whether a state or federal prisoner—failed properly

to raise his claim on direct review, the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice from the alleged ... violations.' ") (quoting *Wainwright v. Sykes,* 433 U.S. 72, 84, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Here, even if Svendsen can show cause for having failed to raise these arguments on direct appeal, for the reasons that follow he cannot show prejudice.

was not required to prove that Rossomando intended to harm the Pension Fund." *Id.* at 202. Accordingly, the Court reversed Rossomando's conviction for plain error.

Svendsen argues that the *Rossomando* Court's reservations are no less applicable to this Court's instruction on the meaning of fraudulent intent in a mail fraud prosecution. Svendsen particularly objects to the Court's definition of an "intent to defraud," by which, the Court stated,

> we mean to act knowingly with a specific intent to deceive for the purpose of causing some financial loss or some action or no action to be taken by somebody else.

(Tr. at 191.) This instruction, says Svendsen, invited the jury to assume that the information on the Safeguard questionnaires had "independent value" to the Pension Fund. This, Svendsen continues, had the effect of eliding the separate determination the jury was required to make, that in addition to intentionally withholding information, Svendsen had also intended to cause financial loss to the Pension Fund by means of the withholding.

▇ Svendsen's argument is unpersuasive. The most reasonable reading of this Court's intent instruction is as a guideline for understanding the idea of fraudulent intent in the context of mail fraud. The instruction states that a finding of fraudulent intent entails a finding of specific intent to cause harm—whether that harm takes the form of financial loss, or "some *action or no action to be taken by some-body else.*" This language does not come within the scope of the concerns animating the Court in *Rossomando,* and Svendsen overreaches in purporting to find those concerns implicated by it. For reasons already discussed, the Government adduced more than sufficient evidence showing that Svendsen had not just lied by withholding information from the Pension Fund, but had lied with the specific intent of defrauding the Pension Fund, by avoiding an obligation to reimburse of which he was very well aware. The jury was prop-

erly instructed that it had to find not just the scheme to defraud—the fraudulent questionnaires—but also a specific intent to defraud the Pension Fund, by causing it financial loss. So instructed, the jury reviewed the evidence, and concluded that Svendsen lied, and lied for the purpose of defrauding the Pension Fund. Accordingly, Svendsen's claim that he was deprived of due process by a prejudicial jury charge is without merit.

### D. *Svendsen's Brady Claim*

Svendsen claims that the Government violated its obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, to disclose exculpatory material, and compounded these violations by its knowing and deliberate use of false and misleading evidence. This conduct, Svendsen argues, deprived Svendsen of due process, and raises sufficient doubt about the validity of Svendsen's conviction on the basis of that evidence to mandate vacatur of his conviction, or at a minimum, an evidentiary hearing to determine the parameters of the Government's misconduct.

▇ Svendsen's claim focuses on "evidence of the procedural invalidity" of the rules under which the Safeguard Limitation was promulgated, which, he says, was known to the Government, and intentionally suppressed. In light of this Court's decision, set forth already, that the evidence purporting to show the "procedural invalidity" of the Safeguard Limitation and the rules underlying its calculation was, in fact, irrelevant to Svendsen's defense, it cannot be said that the Government had any obligation under *Brady* to provide such evidence to Svendsen. In any event, Svendsen fails to identify any of the alleged *"Brady* material" that was not a matter of public record before and during the proceedings against Svendsen, and thus, which was not discoverable by Svendsen through the exercise of due diligence. The Government has no obligation

to make such material available. *See United States v. Payne,* 63 F.3d 1200, 1208 (2d Cir.1995) ("Documents that are part of public records are not deemed suppressed if defense counsel should know of them and fails to obtain them because of lack of diligence in his own investigation."); *United States v. Bermudez,* 526 F.2d 89, 100 (2d Cir.1975) (state's investigative files were not suppressed since defense counsel, who represented one of the defendants in the state proceedings, could have discovered them "with the exercise of due diligence"), *cert. denied,* 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976). Accordingly, Svendsen's claim that his right to due process was violated as a result of the Government's *Brady* violations is without merit, and requires no evidentiary hearing.

### CONCLUSION

For the reasons set forth above, Svendsen's § 2255 petition is denied in its entirety.

SO ORDERED.